Submitted on the record May 3, accused suspended for 30 days June 29, 1982

# In re Complaint as to the Conduct of
## GLENN WALKER,
*Accused.*

### (OSB Nos. 80-14 and 81-7, SC 28533)

647 P2d 468

PER CURIAM.

## PER CURIAM.

In this disciplinary proceeding the Oregon State Bar charges the accused with violation of several Disciplinary Rules of the Code of Professional Responsibility arising from his representation of two different clients. In one case he represented a client in two litigation matters, a personal injury action and a business dispute. In the other, he represented the personal representative of an estate. The Trial Board and the Disciplinary Review Board found the accused not guilty of all charges. We decide the facts on the record made before the Trial Board.

### The Litigation Matter

The accused was charged with violation of the following disciplinary rules:

"DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

* * * * *

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him."

"DR 7-101 Representing a Client Zealously.

(A) A lawyer shall not intentionally:

* * * * *

(3) Prejudice or damage his client during the course of the professional relationship * * *."

The bar alleged that the accused failed to prepare the cases for trial in a timely manner or to communicate with his client and that he failed to take appropriate steps to protect his client's interest in the cases.

In late 1978 or early 1979, the accused agreed to represent the client in his action as guardian ad litem for injuries suffered by his stepson in a bicycle accident which occurred in August, 1977. In February, 1979, the accused agreed to represent the same client in an action against the client which arose out of a business transaction involving a sale of goods by the client to the three plaintiffs.

Each of these cases was being handled by another lawyer at the time the accused agreed to take them over.

The client agreed to pick up the files from the lawyer and deliver them to the accused,[1] but the accused did not receive them until mid-June, 1979. The delay is apparently attributable to an injury and subsequent hospitalization suffered by the client in March, 1979, and a physical illness which interfered with the accused's practice intermittently from March, 1979, until at least March, 1980.

Throughout the accused's dealings with the client, the client made numerous phone calls, sometimes three times a day, to inquire as to the status of both cases. The accused continued to inform the client that when he had something to tell him he would get in touch with him. In the client's view, the accused did not communicate with him with sufficient frequency or keep him adequately informed. In the accused's view, the client sought constant and unnecessary reassurance.

In September, 1979, in exasperation, the client wrote to the accused inquiring as to the status of the two cases. The accused responded by letter in October, informing the client that the defendants had been served in the personal injury case and that he was preparing for depositions in the business litigation. In March, 1980, the client again wrote to the accused inquiring as to the status of the personal injury action. The client stated in the letter that if the accused did not want to pursue the matter, or could not for some reason, that perhaps it should be turned over to another lawyer who was then handling another matter for the client. The accused took this as an indication from the client that he wanted the cases turned over to the other lawyer, and the accused did so without further communicating with the client. He then left on a vacation. However, the client and the other lawyer could not agree on a fee arrangement, and the other lawyer declined to handle the personal injury case.

In early April, 1980, the accused received notice that the client was to be deposed in preparation for the business litigation. He wrote to the client, telling him that it was his understanding that the cases had been turned

---

[1] The testimony conflicts on this point, but the testimony of the accused appears credible and the Trial Board, to whose credibility determinations we give weight, so found.

over to the other lawyer, that he was not in a position to handle the matters any longer, and that it was imperative that the client obtain counsel for the impending deposition. In response to this letter, the client came into the accused's office and demanded that the accused continue to represent him. The accused agreed to do so in both the business litigation and in the personal injury litigation.

Early in their relationship, the client and the accused had agreed to a 25 percent contingent fee. The accused billed the client in early June, 1980, asking $1,000 for "costs and retainer." The client had not understood that he would have to pay costs. He wrote a letter to the accused in mid-July asking why he was being billed for costs when they had agreed on 25 percent of recovery as payment. The client suggested specific steps that he thought the accused should be taking in both the personal injury case and the business litigation. In response, the accused wrote to the client in August, 1980, informing him that he needed the money in order to do the depositions in the business litigation case, and that in view of the client's refusal to pay the costs, he was resigning. The client retained another lawyer to pursue both cases and complained to the Bar.

Although the accused did not communicate with the client as often as the client believed he should have, the record establishes that he kept the client adequately informed of the progress he made with each case. The record suggests delay in the accused's handling of the cases, but it does not establish neglect. There was no prejudice to the client as a result of the accused's handling the cases. The accused's handling of his client's litigation was not exemplary, but neither was it deserving of professional discipline.[2] We agree with the Trial Board and the Disciplinary Review Board that the accused did not violate any Disciplinary Rules in his handling of this client's cases.

---

[2] This case resembles *In re Loew,* 292 Or 806, 642 P2d 1171 (1982), in that the accused deferred action on litigation for which he had no conviction on behalf of an understandably impatient client. Coincidentally in both cases, for example, the clients were retired military pilots, now civilian pilots. In the *Loew* case, however, the procrastination was so aggravated that a filing date was missed and the client's interests were prejudiced. This accused was not so neglectful.

## The Probate Matter

The accused is charged with violation of the following Disciplinary Rules in his representation of the personal representative of an estate:

"DR 1-102 Misconduct.

(A) A lawyer shall not:

\* \* \* \* \*

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

"DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it."

The accused had done legal work for the decedent before her death and agreed to represent the decedent's daughter in her capacity as personal representative for the estate. The charges arose from that representation. We agree with the Trial Board and the Disciplinary Review Board that the accused's conduct did not violate DR 6-101(A)(1), but find that his conduct violated DR 1-102(A)(4) and (5).

The decedent died in March, 1976. The order admitting the will to probate and appointing the personal representative was entered in July, 1976. The inventory was filed in January, 1977. Ten months later, in October, 1977, the accused wrote to the personal representative asking for a list and records of receipts and disbursements in order to compile the final account. He wrote to the probate court in November, 1977, thanking it for "the additional 30-day period in which to get the final account filed." He stated that the account was ready for filing except he had been unable to contact the personal representative to prepare the schedule of receipts and disbursements, in part because she had been injured in an automobile accident and was having

difficulty getting things done. The accident had occurred one-and-a-half years earlier. The personal representative testified credibly that the accident had not interfered in any way with her ability to function as personal representative.

The final account was filed on December 23, 1977. In it, the accused stated that

"All Oregon income, inheritance, and real and personal property taxes have been paid or are being paid at the same time as this Final Account is being executed and appropriate releases will be filed herein before the Decree of Final Distribution is taken?"

This statement was not true. Shortly after this filing, the accused filed a personal property tax clearance for the estate. The only tax which had been paid at the time the final account was filed was a portion of the real property tax. None of the other taxes had been paid. The inheritance tax return and the request for income tax clearance were not filed until December, 1978, a year after the accused represented that all taxes had been paid or were being paid.

The accused's explanation is unpersuasive. He testified that he had been preparing an inheritance tax return when he filed the final account. He testified that a return was not filed until a year later because it had to be "amended" over the course of the year. There is no documentation in the record to support his assertion. The accused's file contained no copy of a return prepared at the time of the filing of the final account. The earliest reference to tax return preparation is a letter of September, 1978, explaining to the court that the accused was in the process of "amending" the inheritance tax return so that it could be filed. There was, of course, no filed return to amend and we take the accused's use of the word to be evasive rather than candid.

In April, 1978, the probate court on its own motion issued an order to show cause why the personal representative should not be removed for neglect in failure to close the estate. A hearing was set for May 15, 1978. At the accused's request, the hearing was reset for June, 1978. It was again reset at the accused's request for August, 1978, but did not take place for an undisclosed reason.

The accused wrote to the court in September, 1978, explaining his progress, or lack of it, with the estate. He reiterated that the delay was due in large part to the personal representative's automobile accident.

The show cause hearing was reset for November, 1978. It was again reset at the accused's request for December, 1978. Also in December, the accused wrote to the court bringing it up to date on the status of the estate. He stated that everything necessary to close the estate had been done except that he had not yet prepared a supplemental schedule of receipts of disbursements for the supplemental final account because he had been unable to get in touch with the personal representative.

The show cause hearing was again reset for January, 1979. For some reason, it was rescheduled for February, 1979. That hearing did not take place, but the accused wrote to the court in late February explaining the delay in closing the estate. Additional inheritance tax had to be paid and the personal representative had delivered the check to the accused after hours and dropped it in his mail slot. The amount of the check was incorrect in that numbers were transposed, but to avoid further delay the accused sent the check to the Department of Revenue with the request that they refund the difference along with the clearance. These items had not yet arrived. The accused also informed the court that he would be "out of town considerably during March" and he went on vacation for three weeks in March. He told the court that he had asked his secretary to forward the final account order for the judge's signature as soon as the tax clearances arrived and that on his return he would have the personal representative pay the final expenses and distribute the assets and then close the estate.

On March 20, 1979, the court on its own motion ordered the removal of the personal representative, and the following day designated a successor.

When the accused returned from vacation and discovered that the personal representative had been removed, he formed a plan to have her reinstated. He asked her to prepare five checks, one for his fee, one for her fee as personal representative, and the other three for distribution to the three heirs. The accused intended to present the

checks to the court along with his affidavit and motion to vacate the order removing the personal representative, as a means of demonstrating to the court that the estate was ready to close. The accused did not intend or anticipate that either he or the personal representative or any of the heirs would present the checks for payment.

The personal representative apparently misunderstood the accused's directions. Instead of giving him all five checks, she slipped the accused's check for attorney fees under the door of his office after hours. She then attempted to cash her own check, which she was unable to do because the funds had been transferred by the successor personal representative. Subsequently, the accused filed the motion to vacate the order removing the personal representative. At the time of filing, he knew that he had received only one check, rather than five, but he did not know that the personal representative had attempted to cash her own. The court denied the motion.

A decree of final distribution was entered in July of 1980 and the order of discharge was entered in August, 1980.

The accused testified that his delay in closing the estate was due to difficulty in obtaining his client's cooperation. It is obvious from the record that she was a difficult client to represent. However, the accused was unable to specify any document in the hands of the personal representative at the date of filing of the final account which he needed for the closing of the estate. The difficulty thereafter related primarily to obtaining documentation for business of the estate occurring during the following year during which the estate was unnecessarily open.

The Bar charged the accused with misrepresenting to the court that the income and inheritance taxes had been paid or were being paid, when in fact he knew that was not the case. It also charged him with preparing checks and directing the personal representative to draw the checks on the estate checking account after he knew she had been removed as personal representative. The bar also charged him with recommending to the personal representative that she effectively ignore the order of the court discharging her. Finally, it charged him with undertaking to handle

the estate of a decedent when he knew or should have known that he was not experienced or competent to handle the matter.

We find, as did the Trial Board and the Disciplinary Review Board, that the accused did not violate DR 6-101(A)(1), Failing to Act Competently, in his decision to handle this estate. The record amply establishes the accused's experience handling probate matters and his professional ability to perform such work.

We also find, as did the Trial Board and the Disciplinary Review Board, that it is not proved that the accused recommended to the personal representative that she ignore the order of the court discharging her, or that she draw checks against the estate for the purpose of depleting the funds. Although the accused did not choose a prudent course as a means of supporting his assertion that the estate was ready to be closed, we find that he acted without the intention or expectation that the personal representative would attempt to cash any of the checks.

The final account is another matter. The accused's statement in it that all taxes "have been paid or are being paid at the same time as this final account is being executed" was false and the accused knew it was false. Even were we to accept his testimony that he was then working on a draft inheritance tax return that he "amended" over the course of the next year, it would not alter a finding that the statement to the court was knowingly false. Although the accused may have intended to prepare the tax returns at some time in the near future, his statement that they were paid or were then being paid was a misrepresentation intended to mollify the court and present the appearance of dispatch in the personal representative's handling of the estate. The accused points to his letter of September, 1978, regarding "amending" of the return as evidence that he did not intend to mislead the court, but that letter does not detract from the knowing falsity of the accused's representation of fact 10 months later. We find by clear and convincing evidence that the accused made a false statement to the court, knowing it to be false, in violation of DR 1-102(A)(4).

■ Regarding the charge under DR 1-102(A)(5), whether the accused's conduct was prejudicial to the administration of justice depends upon its effect on the court's ability to perform its duties. Those duties are specified in the Oregon Probate Code, ORS chs 111-119.

The Probate Code was revised extensively in 1969. The major purpose of the revision was to expedite and simplify the probate of both testate and intestate estates.[3] To this end, the personal representative was authorized to proceed with the administration of the estate without obtaining a court order for individual acts.[4] More responsibility for the handling of the estate was placed with the personal representative, but the probate court retained the duty to supervise the personal representative's performance. ORS 111.085(8). The duty of the probate court, the personal representative and the personal representative's lawyer is the same: to complete probate and close the estate as expeditiously as possible. ORS 114.265; *In re Snyder,* 276 Or 897, 559 P2d 1273 (1976).

Here, in addition to the misrepresentation regarding the estate's tax status, there was a pattern of delay, continuances and shadings of the truth which were intended to placate the court. It had the effect of delaying the probate court taking independent action to expedite the closing of the estate. At the accused's request, the show cause hearing was set over seven times over the course of a year. The accused repeatedly reported to the court that the delays were in part attributable to the personal representative's injuries from an automobile accident, but there is no reason in the record to infer that the injury affected her ability to perform her duties in any way. The conduct may have been intended to protect the accused's client, but it hindered the court's ability to carry out its supervisory function.

■ Misrepresentation and half-truths as to the status of an estate are grave matters. As we stated in *In re Greene,* 290 Or 291, 297-298, 620 P2d 1379 (1980):

---

[3] *See* Foreword to Preliminary Draft, Proposed Oregon Probate Code, August, 1968, p xiv.

[4] *See* Commentary to Part 4, Duties and Powers of Personal Representative, Proposed Probate Code, August, 1968, p 117.

"* * * Our experience has been all judges regularly rely upon the candor, honesty and integrity of the lawyer in handling *ex parte* matters which are presented to them. Extremely important judicial decisions are often made in probate cases, injunction cases and domestic relations cases on *ex parte* application of lawyers. Judges must be able to rely upon the integrity of the lawyer.

"* * * The necessity for complete candor when dealing with the court, particularly in an *ex parte* context, cannot be overemphasized."

We find that the accused violated DR 1-102(A)(4) and (5) by misrepresenting the status of the estate to the court.

In view of our finding that the accused is guilty of violation of other subsections of DR 1-102, we need not go further to determine whether the same conduct also violates the more general language of DR 1-102(A)(6).

The question of appropriate sanction remains. We note that the accused's handling of the estate was hampered by the personal representative's conduct. Many of the accused's delaying tactics were apparently motivated by his desire to protect the personal representative. It is clear that the accused's conduct was not motivated by any thought of personal gain. Nevertheless, we take a grave view of misrepresentation, particularly to the court, and of conduct prejudicial to the administration of justice. Under the circumstances, a 30-day suspension from the practice of law is appropriate.

Accused suspended from the practice of law for 30 days from the effective date of this decision. ORAP 11.03. Judgment to Oregon State Bar for costs.