Argued and submitted January 8, accused is suspended from the practice of law for 18 months from the effective date of this decision April 15, reconsideration denied May 25, 1993

In re Complaint as to the Conduct of

## ROBERT L. McKEE,
*Accused.*

(OSB 89-61, 90-11, 90-135; SC S39378)

849 P2d 509

Dwight L. Schwab, of Schwab, Hilton & Howard, Portland, argued the cause and filed the brief for the accused.

Martha M. Hicks, Assistant Disciplinary Counsel, Lake Oswego, argued the cause for the Oregon State Bar. With her on the brief was Paul Silver, Bar Counsel, Portland.

PER CURIAM

Peterson, J., concurred and filed an opinion in which Gillette, J., joined.

## PER CURIAM

■     This is an automatic and *de novo* review of a lawyer disciplinary proceeding. ORS 9.536;[1] BR 10.1; BR 10.6. The Oregon State Bar (Bar) charged the accused in eight causes of complaint with violation of twelve disciplinary rules and one statute. The trial panel found the accused guilty of violating six different disciplinary rules and imposed a sanction of suspension from the practice of law for six months. On review, the accused challenges the trial panel's findings of guilt and its recommended sanction. The Bar challenges the trial panel's findings of not guilty on two disciplinary violations.[2] The Bar has the burden of establishing the ethical misconduct by clear and convincing evidence. BR 5.2. "Clear and convincing" means highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985). We find the accused guilty of several violations and we suspend him from the practice of law for 18 months.

### FINDINGS OF FACT

A.   *The Morris Complaint*: We find that, in August 1987, Raymond Morris consulted with the accused about what Morris felt was harassment by his neighbor, Foster. The accused wrote Foster a letter, warning him that further harassment would result in legal action against him. Foster's conduct continued. Morris returned to the accused, who for a fee of $2,000 promised to file an action against Foster. The accused considered that to be a high fee for his services, and he set it at that level to discourage Morris from going forward with litigation. Morris agreed to pay the quoted fee.

Before he filed the action, the accused met with Foster and a number of witnesses who told him their versions of the events; they convinced him that Morris might be at fault. At that time, the accused believed that Morris was potentially dangerous to Foster and he told Foster so.

---

[1] ORS 9.536(2) provides that, if the decision of the disciplinary board is to suspend the accused lawyer from the practice of law for a period of longer than 60 days, the matter shall be reviewed *de novo* by the Supreme Court.

[2] In its sixth cause of complaint, the Bar charged the accused with violations of DR 1-102(A)(3) and *former* ORS 9.460(4) [current ORS 9.460(2)] in his representation of Mark Dickerson. The trial panel found the accused not guilty of those violations. The Bar does not challenge the trial panel's decision, and those charges are not involved in this proceeding.

Although the accused had formed the opinion that Morris was mentally unstable and that Morris' version of the circumstances might not be entirely accurate, the accused did little investigation before filing the action. He only drove by Morris' home and requested a medical evaluation of the effects of Foster's conduct on Morris. The accused did not interview any of the seven witnesses whose names Morris had given him.

In October 1987, the accused filed a complaint for Morris, seeking compensatory and punitive damages from Foster for intentional infliction of severe emotional distress. After filing the complaint, the accused did no further investigation of the facts other than to speak occasionally with people who came into his office on other matters and with another neighbor, who disclaimed any knowledge of the facts of the dispute.

Because the accused did not wish to upset Morris, he made a conscious decision to keep him uninformed about the progress of the litigation. The accused did not tell Morris that opposing counsel had threatened to counterclaim for attorney fees, that the case was dismissed for lack of prosecution in April 1988 and later reinstated, that the defendant had filed motions to dismiss, that the accused had filed an amended complaint, or that opposing counsel had filed an answer that sought penalties and attorney fees and alleged a counterclaim for compensatory and punitive damages. The accused also failed to tell Morris that he had set a pre-trial conference, that a trial had been set for January 18, 1989, or that he was negotiating with opposing counsel for a restraining order. The accused did not return Morris' telephone calls. When Morris visited his office from time to time, the accused would tell him that he had heard nothing about the litigation. The accused even told Morris and his wife to go forward with a trip to California between January 10 and February 5, 1989, without telling them that the trial had been set during that time.

At some point, the accused became convinced that Morris would not prevail at trial. About the time that the answer was filed in November 1988, the accused began discussing settlement with opposing counsel. Counsel discussed the possibility of obtaining mutual restraining orders. The

accused did not tell Morris that he was discussing settlement or that he and opposing counsel were considering mutual restraining orders. This failure to disclose settlement discussions was in keeping with the accused's general policy not to tell any of his clients about settlement discussions. In early 1989, the lawyers agreed to resolve the case by way of restraining orders, and the accused agreed to and did draft a proposed order.

Eventually the trial was set for February 7, 1989. At circuit court call on February 6, the accused reported that the case had been settled. At that time, however, the accused and opposing counsel had agreed only to the possibility that the case could be resolved by a mutual restraining order; they had not agreed to any specific terms of such an order. Moreover, on February 6, Morris had not authorized the accused to dismiss the case or to stipulate to a mutual restraining order. In fact, at the time that the case was called, even the accused had some question about whether he had authority to settle the case.

In January 1989, when the accused became aware of the February 7 trial date, he spoke to Morris, who was still vacationing in California. In a telephone conversation that the accused described as "short and to the point," he told Morris that he would not prevail at trial. Morris, however, told the accused that he did not want to dismiss the case. The accused responded that the matter could be resolved by way of a restraining order, an idea of which, in the accused's words, Morris "seemed to approve." The accused then asked Morris to come to his office when he returned to Portland so that they could discuss the matter further. Morris ended the conversation by saying that he wanted to talk to his wife about the accused's suggestion that the case be dismissed and that he would speak to the accused later. The next day, Morris called the office and told the accused's secretary that he did *not* want the case dismissed.

On February 6, 1989, Morris met with the accused. The accused already had been to circuit court call that morning and had reported that the case was settled. He did not, however, tell this to Morris. At this meeting, the accused discussed obtaining a restraining order against Foster. Morris still wanted his day in court and did not understand

that agreeing to a restraining order would end the litigation. The accused then told Morris that he would draft a restraining order and take him to court when the judge signed it.

On behalf of Morris, the accused signed a stipulated judgment that settled both Morris' claim against Foster and Foster's counterclaim against Morris. The judgment was signed by the court on March 8, 1989. The form of the judgment was the result of negotiations that occurred between the accused and opposing counsel after February 6, 1989, and it restrained both parties from certain conduct. The accused never told Morris that he would be restrained from harassing Foster. Even though Morris was denying any wrongdoing with respect to Foster, the accused did not believe that it was important to discuss this with Morris. Morris did not receive a copy of the stipulated judgment until he and his wife later copied the court file.

B. *The Newby-Crosby Complaint*: We find that in February 1988, Gerry Newby (Newby) and Sharon Newby (now Crosby) met with the accused for the purpose of dissolving their marriage. The accused previously had represented Newby in a paternity matter, a criminal matter, a workers' compensation matter, and a matter involving his trucking business; he previously had represented Crosby in a personal injury matter; he had represented the parties' son in a juvenile court matter; and he had answered the family's legal questions since 1968. In 1984, when Newby and Crosby first contemplated dissolving their marriage, the accused declined to represent only Newby, because he previously had represented both parties.

In 1988, Newby and Crosby had been married for 19 years and had three minor children. They owned several vehicles and real property. Newby was a long-haul trucker, who owned his own tractor and trailer and earned a gross annual income of $145,000 (a net income of $35,000 to $45,000). Crosby's separate income was about $1,100 monthly.

When Newby and Crosby met with the accused in 1988, they had not reached agreement on the property, custody, and support issues of their dissolution. They disagreed about those issues in the accused's presence during

two or three appointments at the accused's office. Despite the fact that he had represented Newby and Crosby on several matters previously, the accused did not disclose to them at the first appointment, or at any time, that there was a potential conflict of interest; he did not advise them to seek separate counsel. He merely told them that, if they could not agree, he would be unable to represent either of them. Moreover, the accused did not recognize any area of potential conflict between the parties during the initial consultations. When Newby and Crosby disagreed about property and custody issues in his presence, the accused merely went on to another issue and told them that they would have to settle their disagreements elsewhere.

The property settlement agreement that the accused drafted awarded Crosby one-quarter of the household furnishings, one automobile, and $5,000 for her equity in the family home. Newby was awarded all of the remaining assets of the parties and was obligated to pay all of the family indebtedness, except two department store bills and a loan for the purchase of Crosby's car. Custody of the children was awarded to Newby. No child or spousal support was awarded. The accused never addressed the issue of spousal support with either client.

Although the parties believed that the equity in the family home was $30,000, Crosby accepted $5,000 as her share because she was afraid of her husband. Up to the time she signed the property settlement agreement, Crosby believed that the dissolution judgment would provide for joint custody and would require Newby to provide medical insurance for the children. It did not. Crosby signed the agreement to avoid further arguments with her husband.

After the dissolution judgment was entered, Crosby contacted the accused on a number of occasions. He advised her about her rights with respect to threats by Newby to request child support from her and to demand the return of her automobile. Some time later, Newby failed to pay his share of the family debts, and Crosby began to receive telephone calls from creditors. She then telephoned the accused to ask him what she should do. The accused responded that the family debts were Newby's responsibility. He declined to represent Crosby further, reminding her that he had told her

earlier that he could not represent either party if problems arose out of the dissolution.

To protect herself against the demands of creditors, Crosby then filed a construction lien against the family home. She knew that she had no valid basis for a lien. When Newby discovered the lien, he contacted the accused. When Crosby refused to release the lien, Newby asked the accused to file an action against her, and the accused agreed. Crosby, too, contacted the accused about Newby's failure to pay the family debts. The accused, however, told her to release her lien or "we're going to sue you."

The accused thereafter filed a slander of title action against Crosby, without checking the status of the title to the family home. In fact, when the accused filed the action, Newby no longer held title to the property. Rather, the title company had held back funds to cover the amount of Crosby's lien and had transferred title to Newby's buyer.

The accused filed the action on behalf of Newby, despite the fact that Crosby's new lawyer had advised the accused that such an action could not be maintained because Newby no longer had title to the family home, and had reminded the accused of his ethical obligations to Crosby. Moreover, at no time before or during his representation of Newby in the slander of title action did the accused advise either Newby or Crosby about his potential conflict of interest. Similarly, he did not obtain Crosby's consent to his representation of her former husband after full disclosure. In his answer to the Bar's complaint, the accused admits that he represented Newby in a matter significantly related to the parties' dissolution proceeding when their interests were in actual or likely conflict, but he denied that he filed an action, asserted a position, or took other action on Newby's behalf when he knew or should have known that such action would serve merely to harass or maliciously injure Crosby.

## THE BAR'S COMPLAINT

A. *The Morris Complaint*: In its complaint, the Bar alleged that the accused falsely represented to the circuit court that Morris' case against Foster had been settled and that later he agreed to a settlement and signed a stipulated judgment on behalf of Morris that settled both Morris' claim

against Foster and Foster's counterclaim against Morris without Morris' knowledge, consent, or authority. The Bar further alleged that the accused failed to disclose to Morris:

1. that the litigation had been dismissed by the court on April 20, 1988;

2. that Foster had filed a counterclaim against Morris;

3. the nature of the counterclaim;

4. that the trial was set for January 19, 1989;

5. that the litigation was dismissed by the court a second time on January 18, 1989;

6. that the trial was reset to February 7, 1989;

7. the effect of a restraining order;

8. that the accused was engaged in settlement negotiations; and

9. the terms of the settlement and stipulated judgment.

The Bar alleged that the accused's conduct in the Morris case violated DR 1-102(A)(3);[3] DR 1-102(A)(4);[4] DR 7-102(A)(5);[5] DR 6-101(A);[6] DR 6- 101(B);[7] DR 7-101(A)(1);[8] and DR 7-101(A)(2).[9]

---

[3] DR 1-102(A)(3) provides in part:

"It is professional misconduct for a lawyer to:

"* * * * *

"Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

[4] DR 1-102(A)(4) provides:

"It is professional misconduct for a lawyer to:

"* * * * *

"Engage in conduct that is prejudicial to the administration of justice[.]"

[5] DR 7-102(A)(5) provides:

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"* * * * *

"Knowingly make a false statement of law or fact."

[6] DR 6-101(A) provides:

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

[7] DR 6-101(B) provides:

"A lawyer shall not neglect a legal matter entrusted to the lawyer."

[8] DR 7-101(A)(1) provides:

"A lawyer shall not intentionally:

B. *The Newby-Crosby Complaint*: The Bar further alleged that the accused represented Newby and Crosby as co-petitioners in their dissolution of marriage without the required consent and without full disclosure of the possible effect of joint representation, when the exercise of his independent professional judgment on behalf of each was or was likely to be adversely affected by his representation of the other. The Bar charged that this conduct violated *former* DR 5-105(A) and (B).[10] The Bar's complaint further alleged that, when the accused accepted employment from Newby for the purpose of compelling Crosby to release her lien and, on behalf of Newby, brought an action against Crosby for slander of title, the accused violated DR 5-105(C)[11] and DR 7-102(A)(1).[12]

---

"Fail to seek the lawful objectives of the lawyer's client through reasonably available means permitted by law and these disciplinary rules except as provided by DR 7-101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the right of the lawyer's client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process."

[9] DR 7-101(A)(2) provides:

"A lawyer shall not intentionally:

"* * * * *

"Fail to carry out a contract of employment entered into with a client for professional services but the lawyer may withdraw as permitted under DR 2-110, DR 5-102 and DR 5-105."

[10] *Former* DR 5-105 provided in part:

"(A) A lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, except to the extent provided under DR 5-105(C).

"(C) In situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each."

[11] *Current* DR 5-105 provides in part:

"(C) Except as permitted in DR 5-105(D), a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict. Matters are significantly related if either:

The case was heard by a trial panel, which found, regarding the Morris complaint and the Newby/Crosby complaint, that the accused had not violated DR 1-102(A)(4), 7-102(A)(5), 6-101(A), or 7-101(A)(1), but had violated the other disciplinary rules cited in the Bar's complaint. The trial panel imposed a sanction of suspension from the practice of law for six months.

## ANALYSIS

In this court, the accused argues that this court should find him not guilty of violating any disciplinary rule or statute. He further argues that, if any discipline is justified, then a public reprimand is sufficient. The Bar argues that the accused is guilty of the violations found by the trial panel and that, additionally, the accused's conduct in the Morris case also violated DR 1-102(A)(4) and DR 7-102(A)(5). The Bar argues that the proper sanction should be no less than the six-month suspension imposed by the trial panel.

"(1) Representation of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in connection with any proceeding, claim, controversy, transaction, investigation, charge, accusation, arrest or other particular matter in which the lawyer previously represented the former client; or

"(2) Representation of the former client provided the lawyer with confidences or secrets as defined in DR 4-101(A), the use of which would, or would likely, inflict injury or damage upon the former client in the course of the subsequent matter.

"(D) A lawyer may represent a client in instances otherwise prohibited by DR 5-105(C) when both the current client and the former client consent to the representation after full disclosure.

"(E) Except as provided in DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in an actual or likely conflict.

"(F) A lawyer may represent multiple current clients in instances otherwise prohibited by DR 5-105(E) when such representation would not result in an actual conflict and when each client consents to the multiple representation after full disclosure."

See note 15, infra (defining "full disclosure").

[12] DR 7-102(A)(1) provides:

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the lawyer's client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another."

A.  *The Morris Complaint*: DR 1-102(A)(3) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. The trial panel found the accused guilty of violating this rule for representing to the circuit court that the Morris case had settled and for settling that case without authority from his client. The accused contends that he believed that he had authority to settle the case, and that he had negotiated an agreement with Foster's lawyer at the time he informed the court that the case had been settled. It is undisputed that at that time the actual terms of a restraining order had not been agreed upon; moreover, when the accused made this representation to the court, no mutual restraining order had been approved by Morris.

■      Perhaps, at the time the representation was made to the court, the accused believed that Morris would agree to the order; nevertheless, the accused's representation indicated that an agreement already had been reached, and that was not so. It appears that the accused believed that Morris would not prevail on the merits at trial and that settlement was the preferable option. He may have felt he was acting in his client's best interest. An improper motive, however, is not required to find that a misrepresentation has been made. *See In re Boardman*, 312 Or 452, 456, 822 P2d 709 (1991) (no harm need be intended by misrepresentation). Moreover, the misrepresentation was made to a court and resulted in the dismissal of Morris' case contrary to his express instruction to the accused. A misrepresentation made with the best of intentions is nonetheless a misrepresentation.

■      This court does not take lightly any misrepresentation made to a court by a lawyer. *See In re Recker*, 309 Or 633, 789 P2d 663 (1990) (lawyer violated DR 1-102(A)(3) by informing court that client had failed to maintain contact, when it was lawyer who had failed to maintain contact); *In re Dixson*, 305 Or 83, 750 P2d 157 (1988) (lawyer violated *former* DR 1-102(A)(4) by filing false affidavit with court); *In re Walker*, 293 Or 297, 647 P2d 468 (1982) (lawyer violated *former* DR 1-102(A)(4) by falsely representing to probate court that taxes had been paid). We conclude that the accused's conduct violated DR 1-102(A)(3).

The Bar contends that the trial panel erred in finding the accused did not violate DR 1-102(A)(4) by engaging in conduct prejudicial to the administration of justice when he represented to the court that the Morris case had settled. In *In re Haws*, 310 Or 741, 801 P2d 818 (1990), this court analyzed DR 1-102(A)(4), concluding that "conduct" could mean doing something one should not do or not doing something one should do, 310 Or at 746; that "administration" may refer either to procedural functions or to the substantive interest of a party, *id.* at 747; and that, within the context of that rule, "prejudice" requires either "(1) Repeated conduct causing some harm to the administration of justice; *or* (2) A single act causing substantial harm to the administration of justice," *id.* at 748 (emphasis in original). In this case, the accused did something that he should not have done, and it did affect Morris' substantive interest. Although the conduct was not repeated, we conclude that the intentional misrepresentation to the court, resulting in the dismissal of the Morris case, caused substantial harm to the administration of justice. As noted in *Haws*, a single act causing substantial harm to the administration of justice may support a finding of a violation of DR 1-102(A)(4). *See also In re Smith*, 316 Or 55, 60, 848 P2d 612 (1993) (single instance of threatening a witness violated DR 1-102(A)(4)). We, therefore, agree with the Bar and conclude that the accused violated DR 1-102 (A)(4).

The Bar also contends that the trial panel erred in finding the accused not guilty of violating DR 7-102(A)(5). That rule provides that, "[i]n the lawyer's representation of a client * * *, a lawyer shall not * * * knowingly make a false statement of law or fact." The Bar argues that the same facts that prove a violation of DR 1-102(A)(3) may also prove a violation of DR 7-102(A)(5). The accused knew that he lacked authority to settle the case. When he intentionally and falsely reported to the circuit court that the Morris case had been settled, he knowingly made a false statement of law or fact in violation of DR 7-102 (A)(5). *See In re Hedrick*, 312 Or 442, 447, 822 P2d 1187 (1991) (a knowing misrepresentation in a probate petition was a knowingly false statement of law or fact in violation of DR 7-102(A)(5) as well as conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of DR 1-102(A)(3)). We, therefore, conclude that the accused is guilty of violating DR 7-102(A)(5).

DR 6-101(B) provides that it is professional misconduct for a lawyer to neglect a legal matter. We find the accused guilty of neglect of a legal matter, in violation of DR 6-101(B). The accused agreed to file the action but failed to contact Morris' potential witnesses. *See In re Kissling*, 303 Or 638, 640, 740 P2d 179 (1987) (failure to interview witnesses and investigate claim constituted neglect of a legal matter). The Morris case later was dismissed due to a clerical error in the accused's office. *See In re Jones*, 312 Or 611, 614, 825 P2d 1365 (1991) (failure to appear on behalf of client may constitute violation of DR 6-101(B)); *In re Thies*, 305 Or 104, 110, 750 P2d 490 (1988) (allowing action to pend for one year and ten months and allowing case to be dismissed for lack of prosecution constituted neglect). When the case was reinstated and finally set for trial, the accused made no effort to determine if witnesses would be available. Moreover, throughout the entire course of his representation, the accused failed to keep Morris informed of the progress of the case, including failing to inform him of his potential liability on the counterclaim and for Foster's attorney fees. The accused's conduct violated DR 6-101(B).

DR 7-101(A)(2) provides that a lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services. The accused's handling of this case resulted in several delays in bringing the case to trial. Before his return from California, Morris made it clear to the accused and the accused's secretary that he did not wish his case to be dismissed. By the time Morris returned from California, the actions of the accused had resulted in the dismissal of the case. Although it appears that the accused's actions *were* intended to stop the harassment, it is clear that the accused failed to do what his client asked and what the accused had originally agreed to do.

This case is similar to *In re Boland*, 288 Or 133, 137, 602 P2d 1078 (1979). In that case, this court held that a lawyer's failure to appear, failure to inform the client that the case had been dismissed, failure to withdraw as counsel, and failure to advise the client of his intention not to pursue the case, so as to give the client a chance to obtain another lawyer, constituted intentional failure to carry out an employment contract.

It is clear from the accused's testimony that he decided early in his representation of Morris that the case should not go to trial. Morris, however, wanted his day in court. Throughout much of his representation, the accused and Morris seem to have been working at cross-purposes. The accused's conduct violated DR 7-101(A)(2).

■ B. *The Crosby Complaint: Former* DR 5-105(A) to (C) set forth the rules regarding conflicts of interest between former, current, and multiple clients. *See* note 10, *supra.* The rule makes it clear that a lawyer may represent multiple clients only (1) if it is obvious that the lawyer can adequately represent the interest of each; and (2) if each consents, after full disclosure of the possible effect of such representation on the lawyer's judgment.

In the accused's meetings with Newby and Crosby, it was clear that they disagreed about the issues of child custody and property division. The accused points out that he explained to Newby and Crosby that they needed to agree on matters or he could not represent them, and that he intended to act only as a scrivener to prepare the dissolution papers. That disclosure, however, falls far short of that required by *former* DR 5-105(C), *supra* note 10, which requires a *full* disclosure of the possible effect of multiple representation on the exercise of the lawyer's independent professional judgment on behalf of each client.

The accused did not ensure that the parties had a clear understanding and agreement on the all important questions of child custody and child support. Further, the accused did not disclose that his refusal to render legal advice as to the terms of the settlement had the possible effect of depriving one of the clients of his or her share of the marital assets. *See In re Thies, supra,* 305 Or at 110-11 (failure to inform co-petitioners in dissolution case that pension fund might be marital asset and failure to advise them of conflict of interest violated DR 5-105); *In re Boivin,* 271 Or 419, 424, 533 P2d 171 (1975) (disclosure must explain nature of conflict so clients can understand why it may be desirable for each to have independent counsel with undivided loyalty).

In situations requiring disclosure under *former* DR 5-105(C), it must be "obvious that the lawyer can adequately

represent the interest of each [client]." In this case, it is obvious that he could represent neither Newby or Crosby. In situations involving dissolution of marriage where the parties have minor children and jointly acquired assets, it may seldom be "obvious that the lawyer can adequately represent the interest of each" in a dissolution proceeding.[13] The accused's representation of both Newby and Crosby violated *former* DR 5-105(A) to (B).

The accused's actions in representing Newby against Crosby in the slander of title action also constituted a conflict of interest under DR 5-105(C).[14] Under that rule, absent full disclosure to both parties and both parties' consent, a lawyer may not represent a current client against a former client on a significantly related matter. DR 5-105(C) to (D). The new rules codified this court's holding in *In re Brandsness*, 299 Or 420, 429-33, 702 P2d 1098 (1985). A matter is "significantly related" if it would injure the former client regarding "any proceeding, claim, controversy, transaction, investigation, charge, accusation, arrest or other particular matter in which the lawyer previously represented the former client." DR 5-105(C)(1).

In this case, Newby's slander of title action arose in the context of Crosby's attempt to enforce the provisions of the dissolution judgment that the accused had drafted, and involved the family home, one of the major assets awarded in that judgment. We conclude that the slander of title action was significantly related to the earlier dissolution proceedings and, therefore, in the absence of full disclosure and

---

[13] The conflict of interest disciplinary rules have been significantly amended since this case arose. *See* current DR 5-105(A) to (F) (defining actual and likely conflicts of interest, and distinguishing former and current client representation).

Oregon Formal Ethics Opinion No. 1991-86 lists ten factors that must be present in order for a lawyer's joint representation of parties in a marital dissolution to avoid an actual conflict of interest. Some of those factors include: that there be no minor children of the marriage; that the lawyer must independently conclude that the distribution of assets approximates what would probably be awarded at trial; that the lawyer must independently conclude that neither party would be justified in seeking support payments; and that full disclosure be made and consent obtained. Although that opinion is based on the new rules, and we are applying the old rules in the present case, we note that the present case does not appear to fit any of those requirements.

[14] By the time the accused represented Newby in the slander of title case, the former version of DR 5-105 had been replaced. *See* note 11, *supra*.

Crosby's consent, the accused was prohibited from representing Newby against Crosby in the later action.[15] *See also In re Trukositz*, 312 Or 621, 625-28, 825 P2d 1369 (1992) (under former rule, representation of husband in dissolution proceeding involving custody and paternity issues held improper where lawyer had represented both parties in earlier paternity matter involving child); *In re Brandsness, supra*, 299 Or at 426-27 (under former rule, representation of current client against former client prohibited where lawyer is in position adverse to former client and matter is significantly related to prior representation); *In re Jans*, 295 Or 289, 666 P2d 830 (1983) (under former rule, conflict arose where lawyer drafted agreement on behalf of both parties, and later filed action on behalf of one to enforce the agreement against the other).

## SANCTION

We now turn to the question of what sanction is appropriate for the proven ethical misconduct. In that regard, we look to the American Bar Association "Standards for Imposing Lawyer Sanctions" (1986) (ABA Standards) and Oregon case law for guidance. *In re Trukositz, supra*, 312 Or at 633-34; *see In re Recker, supra*, 309 Or at 639 (illustrating the process). As noted, the trial panel imposed a sanction of suspension from the practice of law for six months.

ABA Standard 3.0 sets forth the following factors to be considered:

"(1)  the duty violated;

"(2)  the lawyer's mental state;

"(3)  the actual or potential injury caused by the lawyer's misconduct; and

---

[15] DR 10-101(B) provides:

"(1) 'Full disclosure' means an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent.

"(2) As used in DR 5-101, DR 5-104, DR 5-105, DR 5-107, DR 5-109 or when a conflict of interest may be present in DR 4-101, 'full disclosure' shall also include a recommendation that the recipient seek independent legal advice to determine if consent should be given and shall be contemporaneously confirmed in writing."

The accused does not argue that he made any such disclosure before agreeing to represent Newby against Crosby.

"(4) the existence of aggravating or mitigating factors."

In the present case, the accused violated duties owed to Morris, Newby, and Crosby, as well as duties owed to the court and the legal system.

The accused's actions caused actual injury to Morris, Newby, and Crosby.

The accused intentionally failed to inform Morris of the progress of his case and intentionally misinformed the court that the case was settled. He knowingly failed to carry out his contract of employment with Morris and was negligent in his handling of the Morris case. He settled Morris' case on terms that Morris did not approve of and did not agree to.

The accused intentionally brought an action against Crosby, knowing that she was a former client and that he had not obtained her consent to do so. Moreover, he failed to advise Newby and Crosby of his potential conflict of interest in representing both of them in their dissolution, and in failing to obtain their consent after full disclosure. Crosby failed to receive any significant legal advice in the dissolution proceeding, which appears to have resulted in an unequal distribution of the marital assets, and eventually led to the situation involving the lien on the house. Crosby's wishes concerning the custody and child support provisions of the dissolution judgment apparently were not respected. There was actual injury to Newby as well, as has been described above.

We next turn to the issue of aggravating and mitigating factors. First, as aggravating factors, we note that the accused has been suspended from the practice of law in the past. *See In re McKee*, 229 Or 67, 365 P2d 1063 (1961) (solicitation of employment). He also has received letters of admonition from the Bar in 1970, for seating an imposter at counsel table and thereby misleading the judge as to the identity of a defendant, and in 1980 for disbursing client trust funds contrary to an agreement with a creditor. ABA Standard 9.22(a). In his representation of Morris, Newby, and Crosby, the accused violated eight disciplinary rules. ABA Standard 9.22(d). The accused has failed to acknowledge the wrongful nature of his conduct in the Morris case, arguing

only that he obtained the best possible result for his client in that case. He also failed to acknowledge the wrongful nature of his conduct toward Crosby, arguing that her behavior, rather then his ethical lapses, caused the problem. ABA Standard 9.22(g). The accused has had substantial experience in the practice of law, having been admitted to practice in Oregon in 1954. ABA Standard 9.22(i).

Mitigating factors include the accused's apparent lack of a dishonest or selfish motive, ABA Standard 9.32(b); his character and reputation,[16] ABA Standard 9.32(g); and the remoteness of the accused's earlier offenses, ABA Standard 9.32(m). Taking those factors into account, we proceed to analyze each of the violations in terms of appropriate sanctions.

ABA Standard 6.11 suggests that, in the absence of mitigating factors, disbarment is generally appropriate when a lawyer makes a willful misrepresentation or knowingly makes false statements in order to deceive a court. Because we find that there are mitigating factors here, we do not find that disbarment is the appropriate sanction for the accused's proven ethical violations.

ABA Standard 4.42 states that "[s]uspension is generally appropriate when (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client." We find that suspension is an appropriate sanction for the accused's neglect and failure to carry out his contract of employment in the Morris case.

ABA Standard 4.32 states that "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to the client." It is clear that, when the accused knew that Newby and Crosby were not in agreement as to several important terms of their dissolution, he had knowledge of his conflict of interest. He did not disclose the possible effect of that conflict. Crosby and Newby were injured as a result of

---

[16] More than a dozen judges, lawyers, and business persons either testified or wrote letters on behalf of the accused.

that conflict. ABA Standard 4.31(c) provides that disbarment may be appropriate when a lawyer

"represents a client in a matter substantially related to a matter in which the interests of a present or former client are materially adverse, *and* knowingly uses information relating to the representation of a client with the intent to benefit the lawyer or another, *and* causes serious or potentially serious injury to a client." (Emphasis added.)

It is arguable that the accused's conduct in later representing Newby against Crosby meets those criteria. We conclude, however, that, although the matters were substantially related and the interests involved were materially adverse, there is not clear and convincing evidence that the accused knowingly used information gained from Crosby during the dissolution proceedings with the intent to benefit Newby in his later slander of title action.

We conclude that the number and type of ethical violations proven and the aggravating factors presented in this case mandate that the accused be suspended from the practice of law for 18 months.

The accused is suspended from the practice of law for 18 months from the effective date of this decision.

**PETERSON, J.,** concurring.

I agree with the majority opinion but write separately to venture the opinion that rarely, if ever, can a lawyer represent both spouses in a marital dissolution proceeding. DR 5-105(E) and (F) currently provide:

"(E)   Except as provided in DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in an actual or likely conflict.

"(F)   A lawyer may represent multiple current clients in instances otherwise prohibited by DR 5-105(E) when such representation would not result in an actual conflict and when each client consents to the multiple representation after full disclosure."[1]

---

[1] The words "actual or" in DR 5-105(E) are surplusage in light of the prohibition of DR 5-105(F) against representing multiple clients with an *actual* conflict, even with "full disclosure."

DR 10-101(B) defines "full disclosure" as follows:

> "(1) 'Full disclosure' means an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent.

> "(2) As used in DR 5-101, DR 5-104, DR 5-105, DR 5-107, DR 5-109, or when a conflict of interest may be present in DR 4-101, 'full disclosure' shall also include a recommendation that the recipient seek independent legal advice to determine if consent should be given and shall be contemporaneously confirmed in writing."

A "likely conflict," DR 5-105(A)(2), always is present between spouses in a marital dissolution proceeding. One reason, perhaps the main reason, for my concern about joint representation of spouses who want to dissolve their marriage is this: When the spouses meet with the lawyer, it is almost certain that one or the other will have some questions. Who is the lawyer *representing* in answering the question? The operative verb in DR 5-105(F) is "represent." The truth is, the lawyer cannot *represent* either spouse against the other. The lawyer cannot zealously represent either of them. Representation of both really means representation of neither. Multiple representation nearly extinguishes the lawyer's ability to exercise independent judgment.

The law, and the Disciplinary Rules, should be sensitive to the all too common situation in which neither spouse can afford *one* lawyer, much less two. Perhaps allowing the lawyer to "represent" both is preferable to having one spouse go unrepresented because, in most cases, things will go well and both sides will be satisfied with the result. I fear, however, that a compelled consequence of joint representation of both spouses is that neither spouse receives the minimum information necessary to make informed decisions.[2]

---

[2] Further on this subject, *see In re Jans*, 295 Or 289, 295 n 7, 666 P2d 830 (1983) (counseling restraint in representing both sides in amicable dissolution), and Moore, *Conflict of Interest in the Simultaneous Representation of Multiple Clients*, 61 Tex L Rev 211, 245-58, 286-87 (1982) (suggesting that permissibility of joint representation turns on whether lawyer "reasonably believes that each client is capable of giving informed and voluntary consent"). Other articles on this subject include: Crouch, *How to Handle Conflicts of Interest*, 9 Fam Advoc 4 (Winter 1987), and Young and Bienstock, *Every Lawyer's Danger Zone*, 6 Fam Advoc 8 (Fall 1983).

I note Oregon State Bar Formal Opinion No. 1991-86, which states:

Gillette, J., joins in this concurring opinion.

---

"At a minimum, the following factors must be present before it can be said that the proposed [joint] representation may not result in an actual conflict that would prohibit joint representation:

"1.   Both parties must agree that the marriage be dissolved;

"2.   There must be no minor children born or adopted during the term of the marriage, and the wife must not be pregnant;

"3.   The marital estate must not contain substantial assets or liabilities;

"4.   The parties must have fully agreed upon the disposition of all assets and liabilities prior to consulting the lawyer;

"5.   The lawyer must be in a position to conclude that each party has provided full disclosure of all assets, as is mandated by ORS 107.105(1)(f);

"6.   Based upon the lawyer's independent professional judgment, the distribution of assets and liabilities agreed upon by the parties must be supported by law and must approximate what would probably be awarded should the parties proceed to trial;

"7.   The parties must agree that neither shall make support payments pursuant to ORS 107.105(1)(d), and the lawyer must independently conclude, after full consideration of relevant case law and the factors set forth in ORS 107.105(1)(d), that neither party would be justified in seeking such an award;

"8.   After a reasonable investigation of the facts, the lawyer must conclude that neither party would be justified in seeking any pendente lite or other interim order under ORS 107.095;

"9.   It must reasonably appear to the lawyer that both spouses are competent to handle their affairs and that neither spouse is acting under duress or undue domination by the other; and

"10.  As required by DR 5-105(A)(1) and Dr 10-101(B), the lawyer must make full disclosure of the potential for conflicts that exist between the spouses, and the spouses must consent.

"If all of the above factors are present, dual representation may be permissible. It should be emphasized, however, that in any particular case, there may also be disputes between the parties on other issues that could lead to the conclusion that dual representation is inappropriate. In addition, a situation in which dual representation is permissible at the outset may turn into one in which dual representation is impermissible."