Argued and submitted April 4, 1991, accused reprimanded February 6, 1992

In re Complaint as to the Conduct of

## Stephen TRUKOSITZ,
*Accused.*

## (OSB 88-89; SC S37583)

825 P2d 1369

Susan K. Roedl, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Steven J. Joseph, La Grande, argued the cause and filed the brief for the accused.

PER CURIAM

## PER CURIAM

This is an automatic and *de novo* review of a lawyer disciplinary proceeding. ORS 9.536;[1] BR 10.1; BR 10.6. The Oregon State Bar (Bar) charged the accused in five separate causes of complaint, with violations of twelve different disciplinary rules. The trial panel concluded that the accused was guilty of violating *former* DRs 5-105(A) and (B) of the Code of Professional Responsibility, but that he was not guilty of the other charged violations. We agree with the trial panel's findings as to the Bar's charges against the accused.

The trial panel determined that the accused should be suspended from the practice of law for 90 days and required to complete a legal ethics program before being reinstated. We modify the trial panel's sanction and reprimand the accused.

Shawnnette Moore (Shawnnette) gave birth to Farrah in April 1977. Farrah's birth certificate recorded that her last name was "Moore." Several weeks later, Shawnnette married Larry Clark (Larry). Although Larry was not Farrah's biological father, he and Shawnnette called her "Farrah Clark." Subsequently, another child, Kelley, was born of the Clark's marriage.

Several years later, Shawnnette became concerned that as Farrah grew older she would learn that Larry was not her biological father. Shawnnette discussed her concern with Larry's mother, Olive Clark (Olive), who was a business client of the accused. Early in 1985, Olive mentioned the matter to the accused. He suggested to Olive that Shawnnette make an appointment to see him.

On May 2, 1985, Shawnnette consulted the accused about Farrah.[2] A few days later, the accused prepared a

---

[1] If the trial panel finds that an accused lawyer has not committed the alleged wrongdoing or determines that the accused lawyer should be disciplined by a reprimand or suspension up to 60 days, either party may seek Supreme Court review. Otherwise, the decision of the disciplinary board shall be final. If the decision of the disciplinary board is to suspend an accused lawyer for longer than 60 days or to disbar the attorney, the matter shall be reviewed by the Supreme Court *de novo*. ORS 9.536.

[2] The accused's billing to Shawnnette for the May 2, 1985 consultation reads:

"5/2   Initial conference with client/   1.3 hrs

paternity affidavit attesting that Larry was Farrah's biological father.[3] On May 6, 1985, Shawnnette and Larry appeared in the accused's office to execute the paternity affidavit before a notary public. Apparently, Larry signed the paternity affidavit without reading it and it is not clear that he knew exactly what he was signing. Later, he stated that he thought that the paternity affidavit "was just going to accomplish a change of name." The Clarks filed the paternity affidavit with the Vital Statistics Unit pursuant to ORS 109.070(5).

On May 6, 1985, the accused considered Shawnnette to be his client.

In 1986, Shawnnette initiated dissolution proceedings against Larry. The accused undertook to represent Larry in those proceedings. The accused did not disclose any potential conflict of interest to either Shawnnette or Larry or seek to obtain their consents to his representation of Larry against Shawnnette in the proceedings. At the disciplinary hearing, the accused testified that when he agreed to represent Larry he knew that the dissolution proceedings likely would raise issues involving Farrah's custody and support. He testified further, however, that at that time he did not believe that his earlier representation of Shawnnette would adversely affect his exercise of independent professional judgment on Larry's behalf.

In the dissolution proceedings, both Shawnnette and Larry sought custody of Farrah and Kelley. In April 1986, Shawnnette's lawyer filed a motion for temporary custody of the children in support of the motion, the lawyer filed Shawnnette's affidavit which stated that she was a fit and proper person to be awarded the custody of *"our minor children."* (Emphasis added.) In response, in April and May 1986, the

---

Research on change of name/
Call to Vital Statistics"

[3] ORS 109.070 provides in part:

"The paternity of a person may be established as follows:

"* * * * *

"(5) By joint declaration of paternity filed with the Vital Statistics Unit of the Health Division of the Department of Human Resources in the form approved by the state registrar * * *. The Vital Statistics Unit shall prepare a new birth certificate * * *."

accused prepared and had Larry sign three affidavits in which Larry either stated or implied that he was Farrah's father. The accused continued to represent Larry through a contested temporary custody hearing.

Shortly after a May 5, 1986, temporary custody hearing, Larry retained another lawyer who filed a response in the dissolution proceeding in which Larry denied that he was Farrah's father. That lawyer subsequently withdrew from the case because of a conflict of interest (not relevant to this disciplinary proceeding). In September 1986, Larry retained another lawyer. Larry's new lawyer represented him in the October 1986 dissolution trial. The dissolution court awarded custody of the children to Shawnnette and ordered Larry to pay support for both Farrah and Kelley. Thereafter, Larry moved for a new trial, arguing that, because he was not Farrah's biological father, he had no legal duty to support her. After substantial litigation, the dissolution court agreed. In February 1987, the court entered an amended judgment that ordered Larry to pay support only for Kelley. Larry's lawyer then filed a complaint with the Oregon State Bar detailing the above facts.[4]

## CONFLICT OF INTERESTS

We first consider the disciplinary violations of which the trial panel found the accused guilty.

In its second cause of complaint, the Bar alleges that the accused undertook to represent Larry in the dissolution proceeding commenced by Shawnnette with the issues being paternity, custody, and support of Farrah; that the accused continued to represent Larry through the temporary custody hearing; that the exercise of the accused's independent professional judgment on behalf of Larry was or was likely to be adversely affected by the accused's prior representation of the Clarks; and that the accused did not seek or obtain the informed consent of either Larry or Shawnnette to the

---

[4] In January 1988, Larry's lawyer wrote a letter to the accused demanding $4,000 for "professional malpractice arising out or your representation of [Larry] in the divorce case." The accused responded with a settlement offer, but asserted:

"Throughout [Larry] indicated he was [Farrah's] father, he wanted custody, he loved his child. The position taken in the Temporary [Custody] Hearing was his position, not mine. The difficulty you faced in convincing the [dissolution] court [that Larry] was not the father, was a result of [Larry's] position."

accused's conflict of interest. The Bar alleges that this conduct violated *former* DRs 5-105(A) and (B).[5]

The trial panel concluded that the accused knew of his representation of Shawnnette in 1985, when he prepared the paternity affidavit. The panel also concluded that, on reviewing Shawnnette's dissolution pleadings in 1986, he also knew that Farrah's custody and support would be at issue in the dissolution proceedings. The trial panel stated:

> "The accused made no disclosure to [Larry] to the fact that he had represented [Shawnnette] in the paternity affidavit preparation nor did he obtain a consent from either [Larry] or [Shawnnette] to represent Larry Clark in the dissolution.

> "The accused testified that he did not know paternity of [Farrah] was going to be an issue in the dissolution proceedings. The accused acknowledged that he saw that in [Shawnnette's April 18, 1986,] affidavit * * * that therein [Shawnnette] stated that [Farrah] was not [Larry's] biological daughter, however, he thought the statement made in the affidavit was one of her lies. The accused [testified] that [Larry] wanted custody of [Farrah] and his other daughter and that [Larry] did not tell [the accused] that he was not the natural father of [Farrah]. The accused knew that custody and support would be issues when he prepared an affidavit

---

[5] *Former* DR 5-105 provided in part:

"(A) A lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue employment if the exercise of the lawyer's independent professional judgment in behalf of the client will be or is likely to be adversely affected by the lawyer's representation of another client, except to the extent permitted under DR 5-105(C)."

The test to determine a violation of *former* DRs 5-105(A) and (B) is outlined in *In re Brandsness*, 299 Or 420, 426-27, 702 P2d 1098 (1985):

"A 'closed file' conflict arises when a lawyer represents a client who is in a position adverse to a former client in a matter that is significantly related to a matter in which the lawyer represented the former client. Thus, a three-factor test can be used to determine if * * * a conflict results:

"1. The adverse party is one with whom the accused had a lawyer-client relationship;

"2. The representation of the present client puts the accused in a position adverse to the former client; and

"3. The present matter is significantly related to a matter in which the accused represented the former client." (Footnote omitted.)

for [Larry] to sign on April 24, 1986 in an attempt to obtain custody of the children for [Larry]. The accused testified that on May 5, 1986 at the hearing on the show cause proceeding [*sic*] he heard [Shawnnette] testify that [Larry] was not the natural father of [Farrah]. The accused testified that as a result of [Shawnnette's] testimony on May 5, 1986, he thought that the allegations needed further investigation. Thereafter, the accused continued to represent [Larry] in the dissolution by preparing an amended Uniform Support Affidavit of [Larry] executed on May 20, 1986."

The trial panel reasoned:

"The accused had a lawyer-client relationship with [Shawnnette] and the accused's representation of [Larry] places him in a position adverse to his former client, [Shawnnette]. The dissolution was significantly related to the matter which the accused represented [Shawnnette] on, which was a paternity affidavit and it significantly related to the liabilities and obligations of the parties in the dissolution because custody, support and ultimately, the issue of paternity were at issue. The accused should have recognized this conflict as soon as he knew that custody and support were going to be issues in the dissolution at the time he saw the petition and affidavit and further, the mere allegation that [Larry] was not the natural father of [Farrah] in [Shawnnette's] affidavit should have immediately alerted him that paternity was a potential issue thereby creating a potential conflict of interest.[6]

"If the foregoing facts had not alerted the accused to the potential conflict, certainly the May 5, 1986 hearing when [Shawnnette] testified that [Larry] was not the natural father of the child, should have immediately indicated to the accused that not only were custody and support an issue, but that paternity was also at issue and as a result, a clear of [*sic*] conflict of interest. The accused, thereafter, in the face of facts clearly showing a potential conflict in interest did not obtain consent of the parties, or resign from representation but, in fact, continued to represent [Larry] in this dissolution, preparing the Amended Uniform Support Affidavit signed on May 20, 1986."

---

[6] We believe that it is implicit in the trial panel's conclusion that, initially, the accused did not know that Farrah's *paternity* would be an issue in the Clarks' dissolution proceeding.

The trial panel found by clear and convincing evidence[7] that the accused had violated *former* DRs 5-105(A) and (B).

We agree with the trial panel's findings as to the Bar's second cause of complaint.

## OTHER CHARGED VIOLATIONS

■ The Bar requests that, on *de novo* review, this court reject the remainder of the trial panel's findings and find the accused guilty of the other charged violations alleged in its complaint. The Bar concedes that its case against the accused on the additional charges rises or falls on whether the accused knew that Larry was not Farrah's father in May 1985 when he prepared the paternity affidavit or, in relation to some of the charges, had such knowledge and in April and May 1986 when he prepared the three dissolution affidavits. We thus proceed to consider the evidence in the record concerning the other charged violations.

In its first cause of complaint, the Bar alleges that, by having the Clarks execute the 1985 paternity affidavit when he knew that Larry was not Farrah's father, the accused engaged in conduct involving dishonesty, fraud, deceit or misrepresentation; that he knowingly made a false statement of fact; and that he counselled or assisted his clients in conduct he knew was illegal or fraudulent. The Bar alleges that this conduct violated *former* DR 1-102(A)(4) (current DR 1-102(A)(3))[8] and *former* DRs 7-102(A)(5) and (7).[9]

---

[7] The Bar has the burden of establishing misconduct by clear and convincing evidence. BR 5.2. "Clear and convincing" means that the truth of the facts asserted is highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985).

[8] DR 1-102(A)(3) provides:

"(A) It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

[9] *Former* DR 7-102(A) provided in part:

"(A) In the lawyer's representation of a client, a lawyer shall not:

"* * * * *

"(5) Knowingly make a false statement of law or fact.

"* * * * *

"(7) Counsel or assist the lawyer's client in conduct that the lawyer knows to be illegal or fraudulent."

In order for the Bar to prevail on its first cause of complaint, it must show by clear and convincing evidence that at the time the accused prepared the 1985 paternity affidavit, he knew that Larry was not Farrah's father.

In his responses to the Bar's investigation, the accused asserted, and at the disciplinary hearing he testified, that Shawnnette told him on May 2, 1985, that Larry was Farrah's natural father, that at least up until May 5, 1986, Larry represented to him that Larry was Farrah's father, and that he was not aware before May 5, 1986, that Larry was not, in fact, Farrah's father.

To prove that the accused knew that Larry was not Farrah's father, the Bar relies on the testimony of Shawnnette, Larry and Olive.

The trial panel concluded that the testimony of the Bar's witnesses "was not persuasive on this issue." The trial panel noted numerous discrepancies in the testimony of Shawnnette, Larry and Olive. Moreover, Larry and Olive both testified that Shawnnette "lies and cannot be believed." The panel found that there was not clear and convincing evidence that when the accused prepared and had the Clarks sign the paternity affidavit in May 1985 he knew that Larry was not Farrah's father.

Where, as here, the testimony of the witnesses is so divergent, a resolution as to who is telling the truth is usually best left to an assessment of credibility. Notwithstanding this court's *de novo* review in a disciplinary proceeding, we normally defer to the trial panel's assessment of credibility because it saw and heard the witnesses. *In re O'Neal*, 297 Or 258, 270, 683 P2d 1352 (1984). Similarly, where the credibility of a witness is a material issue in a disciplinary proceeding, we place substantial reliance on the trial panel's findings of fact. *In re Samuels & Weiner*, 296 Or 224, 226, 674 P2d 1166 (1983).

We agree with the trial panel's findings as to the Bar's first cause of complaint.

■ In its third cause of complaint, the Bar alleges that, in 1986, the accused sought to conceal the falsity of the 1985 paternity affidavit by preparing and having Larry sign three

affidavits stating or implying that Larry was Farrah's father, which then were filed in the dissolution proceedings. The Bar alleges that this conduct violated *former* DR 1-102(A)(4) (current DR 1-102(A)(3)), DRs 7-102(A)(5) and (7)[10] and DRs 7-102(A)(4) and (6).[11]

In order for the Bar to prevail on its third cause of complaint, it must show by clear and convincing evidence that, in 1986, when the accused prepared and had Larry sign the three affidavits stating or implying that Larry was Farrah's father, he knew that Larry was not Farrah's father. The accused testified that Larry maintained that he was Farrah's father until the commencement of the dissolution proceeding.

The accused does not deny that the three affidavits that he prepared and filed in April and May 1986, asserting that Larry was Farrah's father, were, in fact, false. The issue, therefore, is whether at the time he prepared and filed those affidavits the accused knew that Larry was not Farrah's father.

The accused testified that the first time he became aware or even had "an inkling" that, perhaps, Larry was not Farrah's father was on May 5, 1986, during Shawnnette's testimony at the temporary custody hearing where she testified that Larry was not Farrah's father. The accused stated that, at that time, he became concerned and thought the issue of Farrah's paternity required further investigation. The accused testified that, up to that time, Larry had always stated, "I'm the father, I want custody of both these kids." The accused also testified that Shawnnette told him on May 2, 1985, that Larry was Farrah's father.

---

[10] DR 1-102(A)(3) and DRs 7-102(A)(5) and (7) are set forth under our discussion of the first cause of complaint. *See* nn 8 and 9, *supra*.

[11] DR 7-102(A)(4) and (6) provide:

"(A) In the lawyer's representation of a client, a lawyer shall not:

"* * * * *

"(4) Knowingly use perjured testimony or false evidence.

"* * * * *

"(6) Participate in the creation or preservation of evidence when the lawyer knows or it is obvious that the evidence is false."

To prove that the accused knew the truth about Farrah's paternity in 1986, when he prepared and filed the three affidavits in the dissolution proceeding, the Bar relies on the testimony of Larry and of Patricia Rose, who had provided child-care for Farrah and Kelley for several years.

The trial panel expressly concluded that Larry's testimony was at times "unclear or contradictory and unconvincing":

> "The evidence was clear that [Larry] loved and treated both [Farrah and Kelley] equally and, in fact, wanted custody of both of these children. This was confirmed by the testimony of Patti Rose and Olive Clark, his mother. That testimony supports the accused's testimony that [Larry] wanted custody of these children and that the accused understood and believed that [Larry] was the natural father of [Farrah]."

That conclusion was made in reference to the relevant time period in 1986. We defer to the trial panel's assessment of Larry's credibility.

The Bar argues, however, that Patricia Rose told the accused that Larry was not Farrah's father. The accused met with Larry and Rose in 1986, after Shawnnette filed her temporary custody motion. Shawnnette had attached an affidavit to her motion stating, among other things, that during her relationship with Larry, he had beaten her, that he was a heavy drinker and a drug abuser, and that, because he was not Farrah's father, he was vindictive toward that child. Larry told the accused that the statements in Shawnnette's charges against him were untrue. Rose also disputed many of Shawnnette's charges against Larry. Rose testified that she knew that Larry was not Farrah's biological father because Shawnnette had told her so and because she had seen Farrah's birth certificate.

Rose's comments to the accused, however, must be placed in context. During that time, Larry had been telling the accused that Larry was Farrah's father. Normally, Larry would be a more credible source of that information than Rose. The accused already believed that Shawnnette was lying in her 1986 affidavit about Farrah's paternity. The last name "Moore" on Farrah's birth certificate, as the mother's maiden name, would not be uncommon for a child born out of wedlock, as the accused testified, and was not inconsistent

with Larry's paternity.[12] In context, we find that Rose's statements to the accused were not sufficient to establish by clear and convincing evidence that the accused knew, in April and May 1986, that Larry was not Farrah's father. We agree with the findings of the trial panel as to the Bar's third cause of complaint.

In its fourth cause of complaint, the Bar alleges that the accused had a conflict of interest

"because the accused had an interest in concealing the falsity of the paternity affidavit so that the accused's professional judgment was affected by his own self-interest and to his client's Larry Clark's detriment because it was to Larry Clark's best interest to avoid liability for child support payments for Farrah * * *, but to do so, [Larry] would have to deny he was [Farrah's] father * * *."

The Bar also alleges that the accused failed to disclose fully the conflict or to gain Larry's consent to continue the representation. The Bar alleges that this conduct violated *former* DR 5-101(A).[13]

In order for the Bar to prevail on its fourth cause of complaint, it must show by clear and convincing evidence that, at the time the accused prepared and had the Clarks sign the May 1985 paternity affidavit the accused knew that Larry was not Farrah's father and that he continued to conceal the falsity of that affidavit in 1986. Based on its finding that the accused was not guilty under the first cause of complaint, the

---

[12] At the disciplinary hearing, Bar counsel and the accused engaged in the following colloquy:

"Q. [BY BAR COUNSEL] Didn't the fact that Farrah's last name was different than Larry's last name cause you any concern, any curiosity?

"A. No. No, it didn't.

"Q. Why not?

"A. Well, I don't know why it didn't, but it didn't.

"Q. Sure.

"A. So, I mean, that's a pretty common thing when a child is born out of wedlock, for the mother to put her maiden name on it, or the name she is packing at that time. That's a pretty common procedure."

[13] *Former* DR 5-101(A) provided in part:

"Except for the consent of the lawyer's client after full disclosure, a lawyer shall not accept employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

trial panel found that the Bar had failed to prove by clear and convincing evidence the allegations of its fourth cause of complaint. We agree with trial panel's findings as to the Bar's fourth cause of complaint.

In its fifth cause of complaint, the Bar alleges that the accused failed to respond fully and truthfully to inquiries from the disciplinary counsel's office and the Local Professional Responsibility Committee in that at the relevant times the accused denied knowledge that Larry was not Farrah's father and asserted that Larry at all times maintained to the accused that Larry was Farrah's father. The Bar alleges that this conduct violated DR 1-103(C).[14]

The trial panel concluded:

> "The accused has claimed in all of [his] letters and responses to the Bar that [Larry] has either stated or implied that he was the father of both [Farrah and Kelley] and that the affidavits that the accused prepared on behalf of [Larry] were based on that information. The accused denies that he was ever informed that [Larry] was not [Farrah's] father and his testimony at the time of trial before this Trial Panel has been consistent with those responses."

Based on its findings that the accused was not guilty under the Bar's first, third, and fourth causes of complaint, the trial panel concluded that the Bar had failed to prove by clear and convincing evidence the allegations of its fifth cause of complaint against the accused. We agree with the trial panel's findings as to the Bar's fifth cause of complaint.

In summary, we agree with the trial panel's findings as to each of the Bar's causes of complaint against the accused.

## SANCTION

We now turn to the question of what sanction is appropriate for the proven ethical misconduct. In that regard, we look to the American Bar Association "Standards for

---

[14] DR 1-103(C) provides:

"A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

Imposing Lawyer Sanctions" (1986) and Oregon case law for guidance in determining the appropriate sanction. *In re Hedrick*, 312 Or 442, 449, 822 P2d 1187 (1991); *see In re Recker*, 309 Or 633, 638-41, 789 P2d 633 (1990) (illustrating the process).

The Bar suggests that, if the accused is guilty only of the violations alleged in its second cause of complaint, then a reprimand is the proper sanction. Factually similar cases imposing a reprimand include *In re Brandsness*, 299 Or 420, 702 P2d 1098 (1985); *In re Jayne*, 295 Or 16, 663 P2d 405 (1983) (and the cases collected therein); *In re Mumford*, 285 Or 559, 591 P2d 1377 (1979); and *In re Erickson*, 1 DB Rptr 292 (1987). We conclude that a reprimand is the proper sanction.

The accused is reprimanded. No costs allowed.