Argued and submitted November 1, 2001, accused suspended for 60 days
June 7, 2002

# In re Complaint as to the Conduct of

# MARGARETTA EAKIN,
*Accused.*

## (OSB 94-204, 95-193, 97-16; SC S47644)

48 P3d 147

Carl R. Neil, of Lindsay Hart Neil & Weigler, LLP, Portland, argued the cause for the accused. With him on the brief was Roy Pulvers.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and submitted the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused lawyer, Margaretta Eakin (the accused), with multiple violations of the Code of Professional Responsibility in two client matters. In a contract dispute (Schreiber matter), the Bar charged violations of Disciplinary Rule (DR) 1-102(A)(3) (dishonesty); DR 9-101(A) (maintain client funds in trust account); DR 9-101(C)(3) (maintain trust account records); and DR 9-101(C)(4) (prompt return of client property).

In another client matter, a child custody dispute (Schmidt matter), the Bar charged violations of DR 1-102(A)(3); DR 1-102(A)(4) (conduct prejudicial to administration of justice); DR 2-106(A) (excessive fees); DR 7-102(A)(1) (filing suit for purpose of harassment); and DR 7-102(A)(2) (unwarranted claims).

A trial panel of the Disciplinary Board concluded that the accused violated DR 1-102(A)(3), DR 1-102(A)(4), DR 2-106(A), DR 9-101(A), DR 9-101(C)(3), and DR 9-101(C)(4), and recommended that the accused be disbarred.

Our review is automatic. BR 10.1; BR 10.4. On *de novo* review, we conclude that the accused violated DR 9-101(A), DR 9-101(C)(3), and DR 9-101(C)(4), and impose a 60-day suspension. *See* BR 10.6 (stipulating *de novo* review).

## I.   FACTS AND PROCEDURAL HISTORY

The Bar has the burden of establishing alleged misconduct by "clear and convincing evidence." BR 5.2. Clear and convincing evidence means evidence establishing that the truth of the facts asserted is highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985). This court generally gives weight to a trial panel's credibility finding, even though the court reviews disciplinary proceedings *de novo*. *In re Trukositz*, 312 Or 621, 629, 825 P2d 1369 (1992). We find the following facts to have been proven by clear and convincing evidence.

## A.  *Schreiber Matter*

In August 1991, Schreiber hired the accused to represent him in a contract dispute. Schreiber and the accused agreed to an initial flat fee of $3,500, additional fees contingent on recovery thereafter, and a deposit of $3,000 to cover costs. The $3,000 deposit for costs was placed in a trust account.

The accused filed a complaint on Schreiber's behalf in United States District Court. To develop a theory of damages, the accused contacted an expert, Wagner, to assist in the analysis.

In April 1993, the defendant successfully moved for summary judgment, and the district court dismissed the complaint. The accused then filed an appeal in the Ninth Circuit on Schreiber's behalf.

On August 11, 1993, the accused requested that Wagner prepare an estimate of his fee to complete an analysis of Schreiber's damages. On August 20, 1993, Wagner wrote to the accused and informed her that such an analysis would require 50 to 70 hours of work and cost $7,500 to $11,250. In that letter, Wagner also stated:

> "In addition, we have to date incurred fees and expenses totaling $850 related to this matter which have not yet been billed. I will wait until I receive your approval before beginning any further work."

Wagner, however, never sent a bill or invoice to the accused for $850.

On August 24, 1993, the accused forwarded Wagner's letter to Schreiber. In a cover letter, the accused recommended that Schreiber authorize Wagner to undertake the damages analysis and that Schreiber deposit with the accused sufficient funds to cover Wagner's full fee. In addition, the accused mentioned that she needed to pay the $850 to which Wagner had alluded in his letter.

Schreiber rejected the accused's advice and refused to authorize the damages analysis or to provide additional funds to pay Wagner while the appeal was pending, because

he wanted to wait until the Ninth Circuit announced a favorable decision before spending his funds on a damages study.

On September 21, 1993, the accused wrote to Schreiber again to ask him to authorize the damages analysis. The accused also requested that Schreiber fax to her a current bank statement, showing that he had the funds to pay Wagner's fee. The accused was concerned that, after expending effort to obtain a reversal of the summary judgment order, Schreiber might not have the funds to pay for an expert and to continue prosecuting the case.

On September 22, 1993, the accused sent Schreiber a statement indicating that she had deducted $850 from the trust account to pay Wagner an "economic consultant fee." Shortly thereafter, Wagner sent the accused the only invoice that he submitted to her in the Schreiber matter. That invoice, however, was for $140, not $850, reflecting services rendered during the month of August 1993.

Months later, in January 1994, the accused "reimbursed" herself the $850 by withdrawing that amount from the client trust account. In doing so, the accused assumed that she already had paid the $850 to Wagner out of her general business account. The accused concedes that she had never paid Wagner the $850.

In May 1995, after pleading with Schreiber to hire Wagner, the accused informed Schreiber that he needed to get a new lawyer unless he provided the funds to pay Wagner. Schreiber responded that, "[u]nless there is a trial[,] it would be a waste of time and money" and that he could not "afford that type of speculation." Wagner's fees, Schreiber believed, were "probably beyond his means." The accused did not respond.

In September 1995, Schreiber wrote to the accused asking if she were still his lawyer. Again, she did not respond. In January 1996, Schreiber informed the accused that she was fired and asked that the file be sent to him immediately. Because the accused delayed in sending Schreiber the entire file, he eventually sought the Bar's assistance.

In January 1996, the Ninth Circuit affirmed the judgment of the district court dismissing Schreiber's complaint.

In February 1997, the Bar initiated a complaint against the accused, alleging the failure to promptly return the file to Schreiber. The Bar later added the allegation that the accused had misappropriated the $850 from Schreiber.

## B. *Schmidt Matter*

In July 1992, Schmidt and her husband Wacker obtained a dissolution of their marriage. In the dissolution, Schmidt was represented by Werst, and Wacker was represented by McClurg. In mediation, Schmidt and Wacker agreed that, although they would share joint legal custody of their children, Schmidt would have sole physical custody.

From Schmidt's perspective, Wacker's abusive behavior precipitated the dissolution. Schmidt compared Wacker's behavior in their relationship to a "steamroller," and she described herself as "battered." According to Schmidt, during an argument, Wacker had flipped over a chair in which Schmidt had been sitting. Also, according to Schmidt, after she had informed Wacker that she wanted a dissolution, Wacker, the primary breadwinner, had continued living in the home but ceased providing financial support and food for Schmidt and the children. Once Wacker had moved out, he and Schmidt had argued over visitation, and Schmidt had accused Wacker of denigrating her and making her look mean in the children's eyes by suggesting that Schmidt buy things for the children when she had limited income. While the dissolution was pending, Schmidt and Wacker corresponded mostly in writing.

Around the time of the dissolution, Schmidt's relationship with her daughter Jill became strained. Jill moved out of Schmidt's residence to live with Wacker. After moving out, Jill refused to talk to Schmidt. Schmidt suspected that Wacker had alienated Jill's affections toward her intentionally and that Wacker had engineered Jill's decision to move out. Later, Schmidt discovered that, before Jill actually had moved out, she had planned, with Wacker's assistance, to

transfer to another high school without telling Schmidt of her decision.

The same month that the dissolution became effective, Wacker retained a new lawyer, Bomarito, to dispute the custody agreement. With Bomarito's assistance, Wacker moved the court for sole physical custody of both Jill and their son, Brian, claiming only that he would provide a "loving and stable environment" for them.[1] In addition, instead of agreeing to rely on the recommendation of a free mediator from Multnomah County Family Services (MCFS), Wacker proposed that the court appoint a psychologist, Dr. Bolstad, to write a study and recommendation on Brian's custody arrangements.[2]

Prevailing in the custody dispute over Brian was imperative to Schmidt. She recognized that Jill effectively had switched custody, informally, to Wacker. But if Wacker prevailed in his quest to obtain custody of Brian, Schmidt would lose physical custody of both her children.

Werst, the lawyer who represented Schmidt in the dissolution, tired of fighting with Wacker, who was unrepresented for a short time before hiring Bomarito. Believing that Schmidt needed a more aggressive lawyer in the custody battle that loomed ahead, Werst referred her to the accused. Werst stated that "it became apparent that [Wacker] had no intentions of being conciliatory, [and] that he was determined to alienate the children from their mother." Wacker, according to Werst, "truly seemed contemptuous and because of the extreme difficulty of dealing with [Wacker]," Werst referred Schmidt to the accused.

Schmidt felt that Wacker was unreasonable and even violent. She wrote to the accused that "I want [Wacker] to be restrained from coming on my property, scaring Brian and I by banging aggressively on the door, trying to start a

---

[1] Later, Wacker stated in an affidavit that Brian wanted to live with him and not Schmidt. That assertion was incorrect, however, because Brian instead wanted something akin to a 50-50 visitation arrangement, not to live with Wacker full-time. Wacker later corrected his affidavit.

[2] Bolstad was no stranger to the family, as she previously had worked with Wacker and Brian after the dissolution proceedings had begun.

verbal fight with me and threatening me." In her correspondence, repeatedly Schmidt characterized Wacker as "abusive" and "threatening." She often accused Wacker of manipulating the children and instigating crises regarding visitation and custody. Schmidt's accusations suggest that the relationship between Schmidt and Wacker had become bitter, vindictive, and marked by distrust and recrimination. Their relationship was highly strained even before the accused became Schmidt's lawyer, and the accused had stepped into a circumstance that was even more highly charged in light of Wacker's attempt to gain custody of both children.

As a result of Schmidt's perception that Wacker had taken advantage of her, she wanted a lawyer who would fight back and take an assertive stand against Wacker. At the same time, she was learning, with the assistance of a therapist, to "stand up" to Wacker's willfulness and wanted to develop a life in which she was in control. She perceived that Wacker's attempt to obtain greater visitation rights from the court and his request that the children spend more time with him was a part of his method to maintain control over her. Resisting Wacker's attempt to gain greater time with the children—greater, she believed, than the time that he had spent with them when they were married—was her method of asserting independence. Perhaps as a result, one expert characterized Schmidt as "a high maintenance client."

Werst's concerns about the nature of the impending dispute were well-founded. The litigation soon became hard-fought. With Schmidt's approval and encouragement, the accused took a "no stone unturned" approach to the litigation.

Schmidt asked the accused not only to assist with the custody dispute over Brian, but to address Schmidt's allegations that Wacker had violated the parenting agreement and had engaged in harassing conduct toward her. Schmidt asked the accused to: (1) investigate Wacker's refusal to pay one-half of her mortgage fees and tax refund; (2) analyze various visitation issues; (3) respond to a letter from the district attorney regarding child support; (4) review letters that Schmidt had written to another psychologist, Dr. Sheldon, about a recommendation on custody; (5) examine Wacker's

alleged conversion of insurance proceeds that were due and owing to Schmidt; and (6) look into Wacker's repeated refusal to provide a health insurance card for Brian.

The accused's initial action consisted of moving for summary judgment on Wacker's motion for sole custody of Brian. That motion argued that Wacker's change of custody motion was flawed because it failed to establish a change in circumstances sufficient to support any change in custody. If successful, the motion would have cut short Wacker's bid to obtain sole custody of Brian, at least temporarily, and would have obviated the need and expense of a custody study.

The court denied Schmidt's summary judgment motion, but conceded that the decision was a "close call." The court also denied Wacker's request to appoint Bolstad to make a custody recommendation, but did appoint both Sheldon and MCFS to conduct studies regarding custody.

Before trial, the accused attempted to gather information about Wacker's financial circumstances. When she was unable to obtain all of that information by working informally with Bomarito, she deposed several representatives of Wacker's employer. Working from a hypothesis that Wacker's household income was relevant to a child-support calculation, the accused deposed Wacker's live-in girlfriend, Carlson. When Carlson refused to cooperate with the accused's formal discovery efforts, she filed a contempt motion against her.

The accused also deposed Bolstad and Sheldon. The accused wanted to know more about Bolstad's relationship with the family and to obtain her notes. Bolstad had made statements about Schmidt's relationship with Brian and, in particular, had opined that Brian was unhappy but afraid to speak out. The accused wanted to know the basis for those statements, but found Bolstad uncooperative.

The accused had reasons for deposing Shelton as well. Shelton recommended midweek visitations for Brian and his father. The expert from MCFS did not recommend such visits, and the accused and Schmidt were concerned about Shelton's reasons for recommending midweek visits, because they were worried about the effect that such visits

would have on Schmidt and Brian. The accused thought deposing Shelton was appropriate, so that Shelton's testimony would be "pinned down" if weeknight visitations became a significant trial issue.

With Schmidt's approval, the accused researched whether a claim might be made for alienation of Jill's affections. In addition, the accused tried to collect information about Jill's decision to move in with her father. Initially, the accused tried to arrange an informal interview with Jill; when that did not occur, she issued a subpoena. Although the accused recognized that deposing a high-school-age student was unusual and not to be done casually, the accused thought that Jill's information might be relevant to whether it would be appropriate for Brian to move in with Wacker, and whether Wacker was engaging in a pattern of manipulating his children's wishes as to custody. Also, the accused wanted to know what Jill might say at trial if Wacker wanted her to testify as a witness. Ultimately, the accused did not depose Jill.

The accused also asked for a contempt citation against Wacker. Schmidt's supporting affidavit accused Wacker of violating the dissolution decree in many respects, including inviting Brian to spend time with him without consulting Schmidt, telling Jill that she did not have to do anything that Schmidt told her, encouraging Jill to be abusive to Schmidt and Schmidt's parents, ridiculing and denigrating Schmidt in front of Jill and Brian, refusing to comply with the visitation terms of the parenting agreement, making false statements to the court that Jill had run away from home and that Brian wanted to move in with him, and refusing to provide life insurance as he was ordered. Also, according to Schmidt, Wacker changed Brian's primary physician without consulting Schmidt and refused to provide her with an insurance card for Brian, even after being requested to do so several times.

The accused advised Schmidt, in writing, that the outcome of the contempt request was uncertain. "I cannot assure you," the accused wrote to Schmidt, "of a positive outcome if we pursue the contempt matter." At the same time,

the accused expressed concern, even before the change of custody hearing, that the case was becoming expensive. "It really concerns me that so much money has gone into this case. I wish I could be more certain of the outcome re the contempt."

Schmidt asked the accused to withdraw most of the contempt allegations just before trial, because the children's lawyer, Svetkey, and Sheldon persuaded her that the motions should be withdrawn. Schmidt felt that Sheldon was trying to intimidate her into withdrawing the motions in order to make settlement more possible, irrespective of Wacker's behavior. In fact, Schmidt thought that Svetkey and Sheldon were threatening to recommend that custody be given to Wacker unless she relented and withdrew the contempt request. The accused withdrew the contempt motions, except for the one regarding life insurance.

Nine months after Schmidt had retained the accused as her lawyer, the court held a hearing on the custody and child support issues, and the single remaining contempt issue. The trial court denied the change of custody for Brian, increased Wacker's child support obligations to Schmidt, denied the request for contempt, and clarified Wacker's visitation rights.

The court invited the accused to file a request for attorney fees on Schmidt's behalf. The accused submitted her fee request, but only after discounting some of her time. Wacker contested the fee application, and a hearing was held in which Wacker's expert contended that the accused's fees were too high and that she had overcharged Schmidt for her services. The judge decided not to award any fees. The accused, in consultation with Schmidt, filed an appeal of the order denying attorney fees. Later, however, the accused and Schmidt fell into a disagreement about the fees and the costs of the appeal. After obtaining different counsel, Schmidt dismissed the attorney-fees appeal.

After write-offs, the accused charged Schmidt between $63,000 and $66,000 in attorney fees and costs.

## II. DISCUSSION

### A. *Schreiber Matter*

#### 1. *DR 1-102(A)(3)*

■    DR 1-102(A)(3) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" This court has noted that dishonesty, fraud, deceit, and misrepresentation overlap, but are not identical concepts. *In re Starr*, 326 Or 328, 342, 952 P2d 1017 (1998). In particular, dishonesty is a "[d]isposition to lie, cheat or defraud; untrustworthiness; lack of integrity." *In re Hockett*, 303 Or 150, 158, 734 P2d 877 (1987). Under this court's cases, dishonesty includes theft or knowing conversion of client property, such as client funds. *See In re Martin*, 328 Or 177, 185-86, 970 P2d 638 (1998) (discussing concept of conversion in lawyer discipline cases).

■    Conversion may be proved by direct evidence, such as an accused lawyer's testimony. *See In re King*, 320 Or 354, 357, 883 P2d 1291 (1994) (taped confession); *In re Pierson*, 280 Or 513, 516, 571 P2d 907 (1977) (admission to client). In the absence of direct evidence, proof of such charges may be based on reasonable inferences drawn from the evidence. *See In re Phelps*, 306 Or 508, 513, 760 P2d 1331 (1988) (so stating). In *Phelps*, this court concluded that severe financial straits, poor accounting practices, and the lawyer's failure to explain what had happened to the funds in question proved conversion. *Id.* at 515-20.

The Bar points to a number of circumstances surrounding the accused's payment to herself in the Schreiber matter that the Bar contends demonstrate that the conversion was intentional, rather than a mistake. The Bar begins with the undisputed fact that, although Wagner had alluded to $850 in unbilled time in his letter to the accused, Wagner never had sent the accused an invoice seeking payment of that amount. Despite the letter mentioning a figure of $850, the accused paid Wagner's invoice for $140 without contacting Wagner to inquire further whether the $140 invoice bore any relationship to the $850 figure mentioned previously.

As noted above, although the accused often used a reimbursement method, she also paid charges directly from the trust account. Sufficient funds existed in the trust account in August or September 1993 to pay the $850 directly from that account. Nevertheless, the accused chose the reimbursement method, even though there was no invoice to trigger any cost advance.

The Bar maintains that, if the $850 mistake were an innocent one, then the accused had two opportunities to correct it. First, when the accused received the $140 invoice from Wagner, she could have remembered that she already had informed Schreiber several weeks earlier that she was going to pay the $850, and the $140 invoice should have raised a question in her mind. Second, the accused could have noticed the discrepancy when Schreiber asked for an explanation of what Wagner had done to merit his $990 fee ($140 plus $850). Instead, the accused responded to Schreiber's concerns without checking Wagner's invoices for an explanation of the charges.

The Bar also points out that the accused "drained" Schreiber's account through several accounting "mistakes." The first such error had occurred in mid-1992 when the accused added in the previous trust account balance of $936.89 as a "cost," thus removing that amount from the trust account for reimbursement.[3] Another "mistake" had occurred in January 1993, when the accused billed Schreiber for an hour of her time, in what was supposed to be a combination flat-fee contingency case.

Other errors occurred later in 1993, when the accused had paid some costs both directly out of the trust account and then also had reimbursed herself for such expenses. In other words, the accused had paid costs associated with Schreiber's case out of her client trust account and also had "reimbursed" herself for those same expenses from that account. In that regard, the accused paid costs out of the

---

[3] The Bar claims that the accused profited by twice that amount, $1,873.78, presumably because the Bar assumed that the trust account lost that balance in addition to that amount being reimbursed as an expense. Although that amount appears to have been charged as an expense, whether that amount also was deducted from the trust account balance is unclear.

trust account on three occasions—once for a transcript of a summary judgment motion ($150), once for brief covers ($9), and once for Wagner's $140 fee—and also had "reimbursed" herself for those costs as if she had paid them out of her office account. The accused explained those as innocent mistakes and noted that she had made two other mistakes, both of which were in Schreiber's favor. The Bar maintains that the mistakes in Schreiber's favor, however, were corrected quickly—one of them not even being a mistake, yet the mistakes in the accused's favor never were corrected.

While the accused's client trust account was dwindling in the latter half of 1993, the accused engaged in belabored efforts to try to obtain the $12,000 from Schreiber—including repeatedly threatening to resign. The Bar argues that the lack of a reasonable explanation for the accused's tenacity in seeking to add those funds to her trust account suggests the possibility that she intended something outside the normal course of representation once she extracted the funds from Schreiber.[4]

The accused makes three points in response to the Bar's characterization of the evidence. First, she asserts that no direct evidence contradicts her explanation that she had withdrawn the funds under the mistaken belief that she was entitled to reimbursements. Second, she asserts that there is evidence in the record that tends to corroborate her claim that she had transferred the funds mistakenly. In that regard, the accused points out that, in Wagner's letter of August 20, 1993, Wagner stated that he had, "to date, incurred fees and expenses totaling $850 related to this matter, which have not yet been billed." In other words, the letter is some evidence establishing the origin of the accused's mistaken belief. Furthermore, the accused's secretary and bookkeeper at the time, Webb, who had worked with the accused to prepare the billing statements, testified that she "recalled something" about paying the $850, but could not recall seeing an invoice for that sum. Finally, with regard to her second

---

[4] The accused offered various explanations. For example, the accused explained that the damages study had to be performed while the case was pending on appeal because there would be no time to perform such a study if the case were reversed and remanded. Alternatively, the accused explained that the study was necessary because she wanted to know whether the appeal was worthwhile.

point, the accused notes that, in her August 24, 1993, letter to Schreiber, she had commented that she would need to pay Wagner the $850 mentioned in his letter.

As to her third point, the accused maintains that the trial panel's finding that her explanation was not credible stems from the trial panel's fundamental misunderstanding of the evidence with regard to the actual transfer of the funds. Therefore, the accused maintains that we should not defer to the trial panel's assessment of credibility, as would be our general practice. *See Trukositz*, 312 Or at 629 (notwithstanding court's *de novo* review, court normally will defer to trial panel's assessment of credibility).

The trial panel's rejection of the accused's explanation that she simply was mistaken about her right to withdraw the funds from the trust account is premised on the following:

> "The Accused suggests that she must have erroneously supposed that she had paid the $850 out of her own funds and believed that she could appropriately reimburse herself from trust funds. We find this testimony not credible. It was only by Mr. Wagner's August 20 letter that the accused (for the first time) learned that Mr. Wagner had incurred but not billed $850 in time and expenses. *Only eleven days later, she withdrew the funds.*"

(Emphasis added.)

However, the uncontradicted evidence in the record is that the accused did not withdraw the funds 11 days after Wagner's August 20, 1993, letter, as the trial panel found; neither did she actually withdraw the funds in September 1993 when she sent out an invoice noting the purported reimbursement. Instead, the accused did not withdraw the funds from her client trust account until five months later, in January 1994. When she did so, it was as part of an effort by the accused and her secretary/bookkeeper to reconcile the expenses and trust withdrawals associated with Schreiber's case between February and November of 1993. Because the trial panel appears to have premised its determination that the accused's explanation was not credible on its mistaken belief that the accused had transferred the funds to herself

11 days after Wagner's letter, we do not defer to the trial panel's assessment respecting the accused's credibility.

Giving appropriate weight to the accused's plausible explanation of her withdrawal of the $850—an explanation for which there is some corroboration—and in light of the fact that the accused did not withdraw the funds until five months after receiving Wagner's letter, we conclude that the Bar has failed to prove by clear and convincing evidence that the accused violated DR 1-102(A)(3) when she withdrew the $850 from her trust account.

### 2. DR 9-101

The Bar contends that the accused violated DR 9-101(A), DR 9-101(C)(3), and DR 9-101(C)(4). Those rules are straightforward in that a lawyer must: (1) maintain client funds in lawyer's trust account (DR 9-101(A)); (2) maintain adequate records of client property (DR 9-101(C)(3)); and (3) deliver client property to the client when requested (DR 9-101(C)(4)). The evidence supports a violation of DR 9-101(A), because mistakenly the accused removed Schreiber's funds from the client trust account. In addition, the accused failed to maintain adequate trust account records and failed to give Schreiber the $850 when he asked for the unearned portion of his retainer. The accused acknowledges that she violated DR 9-101(A), DR 9-101(C)(3) and DR 9-101(C)(4), and we agree.

### B. Schmidt Matter

#### 1. DR 1-102(A)(3)

In the Schmidt matter, the Bar's charges under DR 1-102(A)(3) are twofold. First, the Bar alleges that the accused engaged in padding her bill. We have reviewed the evidence and concur with the trial panel that the Bar failed to prove by clear and convincing evidence that the accused "padded" her bill.

The Bar's second charge under DR 1-102(A)(3) is that the accused engaged in "churning," that is she engaged in professional activities that had no purpose other than to enrich herself.[5] In particular, the Bar charges that the

---

[5] Churning is defined as a "stockbroker's excessive trading of a customer's account to earn more commissions rather than to further the customer's interests;

accused "misled her client into believing that the accused's pointless strategies and her incredibly high fees were essential to prevent the loss of the client's son." According to the Bar, the accused knew that a less expensive method of achieving the results was possible, but deceived Schmidt into believing that no other set of tactics was possible. The result, the Bar maintains, was that the accused engaged in "unnecessary and wasteful" activities.[6] We do not agree with the Bar's characterization of the accused's actions on Schmidt's behalf as unnecessary and wasteful.

For example, the Bar faults the accused for deposing representatives of Wacker's employer and for deposing the psychologists. In each instance, however, a reasonable argument could be made that those individuals possessed relevant information that was not available by alternative means and that the accused was justified in deposing them to establish a record that would be useful at trial or in motion practice. The accused informed Schmidt that her intention in this case was to "cross every 't' and dot every 'i,' " as she put it, which is what she did. The fact that some of the Bar's experts in this matter suggested that they would have used shortcuts in the underlying litigation does not demonstrate that the accused's approach in this case was unwarranted. As one of the experts testified, the accused acted with due diligence to protect her client's position.

We conclude that the Bar has failed to prove by clear and convincing evidence that the accused violated DR 1-102(A)(3) in the Schmidt matter.

### 2. *DR 1-102(A)(4)*

■■ "It is professional misconduct for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice." DR 1-102(A)(4). That rule has three parts. The Bar must show: (1) that the accused lawyer engaged in conduct by

---

an abuse of a customer's confidence for personal gain by frequent and numerous transactions, disproportionate to the size and nature of the customer's account." *Black's Law Dictionary*, 235 (7th ed 1999).

[6] The Bar also contends that the accused's hourly rate of $160 was excessive. The experts who testified disagreed respecting whether that rate was excessive for a family-law practitioner in Portland in 1992. Hence, the Bar failed to demonstrate that that rate was excessive.

doing something that the lawyer should not have done or by failing to do something that the lawyer was required to do; (2) that the conduct occurred during the course of a judicial proceeding or another proceeding that has the trappings of a judicial proceeding; and (3) that the conduct was prejudicial because it involved several acts that caused some harm to the administration of justice or because it involved a single act that caused substantial harm to the administration of justice. *In re Gustafson*, 327 Or 636, 643, 968 P2d 367 (1998).

■       The Bar contends that the accused's litigation tactics were prejudicial to the administration of justice because those tactics were "unwarranted," complicated any potential settlement, and prevented the parties from communicating with each other rather than through lawyers. As previously explained, we disagree that the accused's actions were unwarranted. The Bar's unspoken premise is that a lawyer has a duty to posture a case for settlement and then settle the dispute. Although that might be appropriate in many cases, the disciplinary rules do not require that a lawyer posture a case for settlement rather than trial, unless the lawyer understands that the client's interest requires the lawyer to do so. Moreover, vigorous preparation for trial may in some cases provide the best impetus for settlement. Preparing a case for trial often includes deposing all major witnesses and preserving their testimony, and might include gathering documents from third parties, by subpoena if necessary. That is what the accused did in this case. Although other lawyers might have prepared the case differently, or gathered information more efficiently, or not bothered at all, the accused's conduct was, nevertheless, within permissible bounds.

Finally, it was reasonable, given the history of Wacker's allegedly abusive treatment of Schmidt and the couple's inability to communicate effectively with each other, that communications should occur through their lawyers. Indeed, Schmidt wanted that arrangement. Hence, the Bar's arguments are not well taken.

For the foregoing reasons, we conclude that the Bar has failed to prove by clear and convincing evidence that the accused undermined the administration of justice in violation of DR 1-102(A)(4).

### 3. *DR 2-106(A)*

■ DR 2-106(A) provides that "[a] lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee." Moreover, DR 2-106(B) provides that "[a] fee is clearly excessive when * * * a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee."[7]

The Bar's attempt to blame the accused for the entire cost of the litigation in the Schmidt matter is misplaced. Our review of the evidence convinces us that Wacker's aggressive and uncooperative attitude that persisted both before the dissolution and after, combined with Schmidt's desire not to surrender to Wacker's tactics, contributed significantly to the high cost of the litigation. At the outset, according to Schmidt, Wacker physically and verbally had abused her and manipulated the children. As Schmidt contended, Wacker was abusive, domineering and uncooperative, and his attitude continued throughout the litigation. To cite but a few examples, Wacker wanted an independent lawyer for the children; he refused to have MCFS complete a study and instead wanted a private psychologist appointed; he (and Carlson) refused to provide financial information; and he failed to cooperate regarding insurance coverage for Brian. In responding to each of those events, the accused and Schmidt reacted to complexities that Wacker had created. In

---

[7] That rule provides various considerations as to when a fee may be considered excessive:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

"(3) The fee customarily charged in the locality for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by the circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

"(8) Whether the fee is fixed or contingent."

DR 2-106(B)(1) to (8).

particular, the accused's need for discovery and the difficulty in obtaining that discovery increased Schmidt's fees.

In addition, Schmidt's unconciliatory attitude toward Wacker also contributed to the expense of the litigation. She had wanted, and in fact, approved the accused's assertive representation and the legal activities in which the accused engaged. Her testimony to the contrary, before the trial panel, is inconsistent with her contemporary correspondence to the accused, where she repeatedly thanked the accused for standing up to Wacker. In light of the parties' hardened attitudes toward each other, the importance of the litigation to them, and the aggressive legal struggle that they precipitated, encouraged, and abetted, we conclude that the accused's fee was not clearly excessive.[8]

We conclude that the Bar has failed to prove by clear and convincing evidence that the accused violated DR 2-106(A).

## III. SANCTION

In addition to its own cases, this court relies on the American Bar Association's Standards for Imposing Lawyer Sanctions (1991) (amended 1992) (ABA Standards) for guidance in determining the appropriate sanction for lawyer misconduct. In determining the appropriate sanction and before attempting a tentative estimate of the potential sanction this court preliminarily weighs: (1) the duty violated; (2) the accused's mental state; and (3) the actual or potential injury. *In re Devers*, 328 Or 230, 241, 974 P2d 191 (1999). We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted. Finally, we compare prior Oregon cases and the sanctions imposed in them before determining on a final sanction. *Id.*

A. *Preliminary Analysis*

In violating DR 9-101(A), (C)(3), and (C)(4), the accused mishandled her client trust account and failed in her duty to preserve a client's property. ABA Standard 4.1. As a

---

[8] Also, the experts who testified in this matter were divided on the issue whether the accused's fees were clearly excessive.

result, Schneider was injured when the accused paid herself more than she was entitled.

A "[r]eprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client." ABA Standard 4.13. By contrast, "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client. ABA Standard 4.12. Here, although we have concluded that evidence did not establish that the accused acted knowingly, she "should have known" that she was dealing improperly with the funds. Thus, preliminarily, suspension is the appropriate sanction.

## B.  *Aggravating and Mitigating Factors*

"[A]ggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.21. Here, the aggravating circumstance is substantial experience in the practice of law. ABA Standard 9.22(i). By 1993, when the accused mishandled the trust account, she had been a member of the Bar for over 20 years, had extensive experience in private practice, and was held in high professional regard. We conclude that the accused's substantial experience weighs heavily against her as we determine a sanction for her mishandling of the trust account.

"[M]itigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31. The Bar concedes that the accused was cooperative, and that there was a delay in the disciplinary proceeding. *See* ABA Standard 9.32(e) & (i) (two mitigating factors). We conclude that the one aggravating circumstance—substantial experience in the practice of law—outweighs the mitigating circumstances.

## C.  *Oregon Cases*

Generally, this court has concluded that a reprimand is an appropriate sanction for unintentional mistakes in trust account management. *See, e.g., In re Mannis*, 295 Or 594, 668 P2d 1224 (1983) (lawyer reprimanded for commingling office and client funds through mistakes of bookkeeping assistant).

Here, however, as noted above, the accused "should have known" that she was dealing improperly with the trust account. That, combined with the accused's substantial experience in the practice of law, require that the accused be suspended from the practice of law for 60 days.

The accused is suspended for 60 days, effective 60 days from the date of the filing of this decision.